**In the Matter of UNITED CASKET CO., INC., Bankrupt.**

**YORK–HOOVER CORPORATION and Elgin Metal Casket Co., Inc., Plaintiffs,**

v.

**UNITED CASKET CO., INC., Department of Taxation & Finance of the State of New York and Internal Revenue Service of United States of America, Defendants.**

Nos. 78 C 78, 78 C 196 and 76 B 2740.

United States District Court,
E. D. New York.

March 27, 1978.

Abraham, Koenig & Silver, New York City, for plaintiffs; Jacob W. Abraham, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, for defendant Dept. of Taxation; Paul E. Dahlman, Deputy Asst. Atty. Gen., New York City, of counsel.

Finkel, Nadler & Goldstein, New York City, for defendant United Casket Co.; Harold S. Berzow, New York City, of counsel.

### Memorandum of Decision

MISHLER, Chief Judge.

York-Hoover Corp. together with Elgin Metal Casket Co. ("York-Elgin") and the New York State Department of Taxation & Finance ("State") separately appeal from a decision rendered by Bankruptcy Judge C. Albert Parente on December 9, 1977, in an adversary proceeding which concerned the priority of various claims. York-Elgin appeals from that aspect of the decision which found the State possessed of a valid and prior tax lien on the bankrupt's assets (78 C 78). The State appeals from that part of the holding which postponed payment on a portion of its claim (78 C 196). Related as they are, we consolidate the appeals.[1]

The essential facts are not in dispute. Prior to its adjudication in bankruptcy, United Casket Co. was a manufacturer of burial vaults and caskets. Failing financial conditions in 1975 caused the firm to ignore several sales tax assessments filed by the State during the latter part of that year. The State, on April 7, 1976, issued three warrants commanding the sheriff, after filing the warrants with the county clerk, to levy upon and sell United's property in satisfaction of the tax deficiency. The warrants were duly filed, but no levy followed. Instead, the parties executed an agreement which permitted United to pay the debt in weekly installments. The required payments were made until the commencement of Chapter XI proceedings; at present the deficiency stands at $49,144.50.

The York-Elgin claim derives from a security agreement executed on May 3, 1976. At that time, United was indebted to the claimants in an amount exceeding $200,000 for goods previously sold and delivered and monies advanced. In order to guarantee continued credit, United granted York and Elgin a security interest in all of its inventory, accounts, contract rights and general intangibles then owned or thereafter acquired. The security interest, embodied in an agreement executed on May 3d, was perfected on May 12, 1976 by the filing of requisite financing statements with the Secretary of State and Queens County Register. Thereafter, York and Elgin extended further credit on purchases of manufacturing supplies until the advent of reorganization proceedings.

By September 24, 1976, United's indebtedness to York and Elgin exceeded $325,000. Unable to meet its obligations, United, on that day, filed a petition for reorganization with the Clerk of the Court, pursuant to Chapter XI of the Bankruptcy Act. The petition was granted by order dated September 27, 1976, and United was continued as debtor-in-possession. A plan for reorganization was drawn, but could not be funded. Hence, on February 16, 1977, with open accounts receivable totaling $206,407.27, United was adjudicated bankrupt. Inventory and equipment were thereafter sold at public action realizing some $25,550.

---

1. There being no opposition to York-Elgin's motion for consolidation, the motion is granted.

During the pendency of Chapter XI proceedings, York-Elgin filed suit in the bankruptcy court seeking relief from the general stay provisions contained in Rule 11–44, Rules Bankr.Proc., and a declaratory judgment determining the priority of their security interest vis-a-vis the liens purportedly possessed by the State Department of Taxation & Finance and the Internal Revenue Service.[2] The issue was submitted to the bankruptcy court on stipulated facts.

After hearing extended argument, the bankruptcy court, in a decision rendered on December 9, 1977, found the State possessed of a valid and prior lien by virtue of New York Tax Law § 1141(b) (McKinney's 1969). That provision, which sets forth the available enforcement procedures the State may follow in pursuing collection of a sales tax deficiency, permits the tax commission to issue warrants and thereupon levy on the taxpayer's assets. Warrants duly docketed with the county clerk, the section provides, "shall become a lien upon the title to and interest in real and personal property of the person against whom the warrant is issued." New York Tax Law § 1141(b). Construing the statute to require nothing more than docketing, the bankruptcy court held the State's action sufficient to vest it with a prior lien notwithstanding its failure to levy on the personal property. However, the consequent lack of possession accompanying the tax warrants, the bankruptcy court held, triggered the operation of § 67(c)(3) of the Bankruptcy Act, 11 U.S.C. § 107(c)(3), which postpones payment of the tax deficiency to the costs and expenses of administration and priority wage claims. Construing the statute further, the bankruptcy court went on to rule that the State would first have to await York-Elgin's participation in the estate before receiving payment of the postponed increment.

It is from this ruling that both sides appeal. York-Elgin takes issue with the first part of Bankruptcy Judge Parente's decision holding the State possessed of a

prior lien. The State, in turn, attacks the other aspect of the ruling which further postpones payment of that increment of the tax lien representing the amount of administration and priority wage claims to plaintiff's participation in the estate. We turn to examine first the viability of the State's lien.

Section 1141(b) of the New York Tax Law provides in pertinent part:

As an additional or alternate remedy, the tax commission may issue a warrant, directed to the sheriff of any county commanding him to levy upon and sell the real and personal property of any person liable for the tax, which may be found within his county, for the payment of the amount thereof, with any penalties and interest, and the cost of executing the warrant, and to return such warrant to the tax commission and to pay it the money collected by virtue thereof within sixty days after the receipt of such warrant. The sheriff shall within five days after the receipt of the warrant file with the county clerk a copy thereof, and thereupon such clerk shall enter in the judgment docket the name of the person mentioned in the warrant and the amount of the tax, penalties and interest for which the warrant is issued and the date when such copy is filed. Thereupon the amount of such warrant so docketed shall become a lien upon the title to and interest in real and personal property of the person against whom the warrant is issued. The sheriff shall then proceed upon the warrant, in the same manner, and with like effect, as that provided by law in respect to executions issued against property upon judgments of a court of record . . . if a warrant is returned not satisfied in full, the tax commission may from time to time issue new warrants and shall also have the same remedies to enforce the amount due thereunder as if the state had recovered judgment therefor and execution thereon

---

**2.** The Internal Revenue Service, which filed a $4,109.06 federal tax assessment on September 27, 1976, has conceded that its lien is inferior to plaintiff's security interest and the State's tax lien.

had been returned unsatisfied. (emphasis added.)

Considering the frequent use of this enforcement alternative, the paucity of case law interpreting the command and reach of the statute is surprising.

The State, emphasizing the clarity of the underscored sections, argues that the simple filing of the warrants and their docketing by the county clerk is sufficient to create a choate lien on the bankrupt's real and personal property; that the statutory language of execution and levy only prescribes enforcement procedures and in no way limits or qualifies the efficacy of the lien once it properly attaches. York-Elgin on the other hand urges the court not to isolate the highlighted language, but to consider the full command of the statute. Pointing to that part of the provision which directs the sheriff to ". . . proceed upon the warrant in the same manner and with like effect, as that provided by law in respect to executions issued against property on judgments . . .," York-Elgin argues that the principles on which the attachment of judgment liens turn also control the efficacy of state tax liens. More specifically, York-Elgin urges the relevance of Article 52 of New York's Civil Practice Law and Rules which pertains to the enforcement and priority of judgments. The mere docketing of warrants, York-Elgin argues, gives rise to a choate lien only on the debtor's real property, CPLR § 5203 (McKinney's 1972). Any lien attaching to personal property on docketing and issuance of the execution, York-Elgin contends, was of limited duration and fell when the State failed to levy on United's property either by seizure or service of the execution, CPLR §§ 5230 and 5232 (McKinney's 1968).

We cannot view the pertinent provision of the Tax Law with the same myopic simplicity the State does. York-Elgin's suggested construction of § 1141(b) is at the very least persuasive. The statute, when considered in its entirety, can be logically read to grant the State, upon the docketing of tax warrants, a choate lien on the taxpayer's real property and an inchoate lien subject to perfection by levy on his personalty. Such a construction is entirely consistent with the requirements of CPLR Article 52 and the direction in § 1141(b) requiring the sheriff, after docketing, to proceed upon the warrant "in the same manner and with like effect" as under executions against property issued upon judgments. Moreover, such an interpretation lends meaning to the last sentence of the subdivision which permits the State to issue new warrants should the original be returned unsatisfied. *Accord; United States v. Weather Service, Inc.,* 74–2 U.S. Tax. Cas. 9724 (E.D.N.Y.1974) (docketing of warrants in absence of levy does not give State "perfected" lien); *In Re Estate of Robbins,* 74 Misc.2d 793, 346 N.Y.S.2d 86 (Sur.Ct.1973) (lien attaches to personalty only upon service of execution levies, not upon docketing); *Lacaille v. Feldman,* 44 Misc.2d 370, 253 N.Y.S.2d 937 (Sup.Ct.1964) (filing of warrant gives State equal parity with creditor who has docketed judgment; State obtains choate lien on real property and inchoate lien on personalty until levy.)

We must however, reject York-Elgin's interpretation in the face of the Second Circuit's decision in *In The Matter Of Thriftway Auto Rental Corp.,* 457 F.2d 409 (2d Cir. 1972). There, the court was presented with a provision of almost identical language contained in New York City's Administrative Code (§ N46–11.0(b)), and was asked to construe the effect of docketed warrants unaccompanied by a sheriff's levy. The court, although noting the persuasiveness of the interpretation similarly urged by York-Elgin here, held that the mere docketing of tax warrant created a choate lien on the debtor's personalty. To construe the statute otherwise and treat with parity docketed warrants and judgments, the court reasoned, would render meaningless the subsection's third sentence declaring a warrant properly docketed a lien on the taxpayer's personal property. For the docketing of a private judgment under the CPLR, the court observed, ". . . creates no lien at all upon personal property, but merely enables a judg-

ment creditor to obtain a lien through further action . . . ." *Id.* 457 F.2d at 411.[3] *See Corrigan v. United States Fire Insurance Co.,* 427 F.Supp. 940 (S.D.N.Y. 1977); *Argiriou & Finkel v. Marciante Luncheonette II, Inc.,* 64 Misc.2d 660, 315 N.Y.S.2d 448 (Sup.Ct.1970); *United States v. Comptroller of the City of New York,* 248 F.Supp. 939 (S.D.N.Y.1965); *In Re Lums 52nd Street Corp.,* 61–B–194 (S.D.N.Y. 1963); *In Re Saratoga Paint Co.,* 31 F.Supp. 514 (S.D.N.Y.1940) *aff'd sub. nom. Davis v. City of New· York,* 119 F.2d 559 (2d Cir. 1941).

■ As it is, a warrant issued after a notice of assessment has gone ignored, unlike a docketed judgment, identifies the lienor, the property subject to the lien and its amount. As such, the test of choateness is sufficiently met. *United States v. Vermont,* 377 U.S. 351, 358, 84 S.Ct. 1267, 1271, 12 L.Ed.2d 370 (1964). To require more would resurrect the double standard in determining the choateness of federal and state liens, which was unanimously repudiated by the Supreme Court in *United States v. Vermont. Thiftway,* 457 F.2d at 413. We find, therefore, that the State is possessed of a prior lien as the warrants were docketed before perfection of York-Elgin's security interest.

■ Yet, the State's lien, although prior in time, was unaccompanied by possession. Section 67(c)(3) of the Bankruptcy Act, 11 U.S.C 107(c)(3), speaks precisely to this situation. It provides that:

> Every tax lien on personal property not accompanied by possession shall be postponed in payment to the debts specified in clauses (1) and (2) of subdivision (a) of section 104 of this title. Where such a tax lien is prior in right to liens indefeasi-

ble in bankruptcy, the court shall order payment from the proceeds derived from the sale of the personal property to which the tax lien attaches, less the actual cost of that sale, of an amount not in excess of the tax lien, to the debts specified in clauses (1) and (2) of subdivision (a) of section 104 of this title. If the amount realized from the sale exceeds the total of such debts, after allowing for prior indefeasible liens and the cost of the sale, the excess up to the amount of the difference between the total paid to the debts specified in clauses (1) and (2) of subdivision (a) of section 104 of this title and the amount of the tax lien, is to be paid to the holder of the tax lien.

The express languagé of the provision leaves little doubt as to its applicability herein. The absence of possession is uncontroverted. Thus, it is clear that the State's interest is subordinated to the rights of the trustee under section 67(c)(3) of the Act; payment of the State's tax lien is postponed in time to payment of administrative and priority wage claims. *In Re Penn Central Brewing,* 114 F.2d 1010, 1012 (3d Cir. 1940), *cert. denied* 312 U.S. 685, 61 S.Ct. 612, 85 L.Ed. 1123 (1941).

That the state suffers by its inaction is entirely consistent with the intendment and purpose of the subordination provisions contained in section 67(c)(3), i. e. the protection of administration and wage claims against the accumulation of non-possessory liens. *Goggin v. Division of Labor Law Enforcement of California,* 336 U.S. 118, 127 n.8, 69 S.Ct. 469, 474–75 n.8, 93 L.Ed. 543 (1949); *In Re City of New York v. Hall,* 139 F.2d 935, 936 (2d Cir. 1944). As Judge Frank observed in *Hall,* when a statutory lienor chooses "to slumber on its rights, Congress

---

3. York-Elgin, also, attacks the constitutionality of § 1141(b) arguing that the summary nature of the enforcement procedure, which grants the State a lien on the taxpayer's property "without notice ˙and an opportunity to be heard" violates the due process clause. The claim is specious. Section 1138 of the Tax Law requires the State, where proper sales taxes are

not paid, to issue and serve a notice of assessment fixing the amount of the tax. The taxpayer, within ninety days thereof, can petition the commission for a hearing. Judicial review of an adverse decision, by way of an Article 78 proceeding, is available. Only after notice and an opportunity to be heard has been extended can warrants issue.

intended to penalize such somnolence." *Id.* 139 F.2d at 936; *Accord; In Re Thiftway Auto Rental Corp.*, 457 F.2d at 413.

Finding section 67(c)(3) applicable, we turn to consider the problem of circuity posed by the subordination of the tax lien to claims of the administration and wage earners which are otherwise subordinate to the subsequent indefeasible lien arising from York-Elgin's perfected security interest. Prior to the amendment of section 67(c) in 1966, the provision was silent as to the effect of postponement on inferior liens. The absence of any reference caused a host of different results. *Compare; In Re Quaker City Uniform Co.*, 238 F.2d 155 (3d Cir. 1956) *cert. denied,* 352 U.S. 1030, 77 S.Ct. 595, 1 L.Ed.2d 599 (1957) (inferior lien subordinated to § 64(a)(1) and (2) claims by implication); *New Orleans v. Harrell,* 134 F.2d 399 (5th Cir. 1943) mortgage otherwise inferior to tax lien not accompanied by possession satisfied first under command of § 67(c)); *California State Department of Employment v. United States,* 210 F.2d 242 (9th Cir. 1954) (postponed increment of tax lien satisfied only after participation of inferior lien); *In Re American Zyloptic Co.,* 181 F.Supp. 77 (E.D.N.Y.1960) (mortgage to participate in full before payment of postponed increment on tax lien); *Jordan v. Hamlett,* 312 F.2d 121 (5th Cir. 1963) (tax lien satisfied only to extent it exceeds administrative and wage claims); *In Re Empire Granite Co.,* 42 F.Supp. 450 (M.D.Ga. 1942) (tax lien satisfied only to extent it exceeds § 64(a)(1) and (2) claims).

Taking cognizance of these inconsistent results, Congress observed that:

> [t]he overall effect of these decisions on the commercial world has been to create considerable uncertainty as to the strength of secured credit. As a result of the *Quaker City* decision, particularly, the problem has become serious in the entire field of secured financing. By destroying the position of valid consensual liens solely because of the fortuitous intervention of a postponed lien, the *Quaker City* doctrine can only result in either the curtail-

ment of credit or an increase in interest rates . . . [A]side from the merits or shortcomings of these decisions, the simple fact that a section of law is susceptible to a seemingly unlimited variety of interpretations is reason enough for its amendment. H.Rep.No.686, 89th Cong., 1st Sess. (1965), S.Rep.No.1159, 89th Cong. 2d Sess. (1966) *reprinted in* [1966] *U.S.Code Cong. & Admin.News,* pp. 2456, 2460.

Hence, with the hope of eliminating the problems of circuity, section 67(c)(3) of the Act, 11 U.S.C. § 107(c)(3), in its current form was enacted by Congress in 1966.

■ While this most recent expression of Congress is indeed respectable, the bare language of the revision is not without its interpretive problems. *See gen.* 4 *Collier on Bankruptcy* § 67.27(3.1) (14th Ed. 1975). Nevertheless, if reference is made to the accompanying House and Senate Reports, *see* H.Rep.No.686, 89th Cong., 1st Sess. (1965); S.Rep.No.1159, 89th Cong., 2d Sess. (1966) *reprinted in* [1966] *U.S.Code Cong. & Admin.News,* pp. 2456, 2462–64, the intended result is entirely clear. With the 1966 amendment, Congress expressly sought to adopt the solution reached by the courts in *California State Department of Employment v. United States; In Re American Zyloptic Co., Inc.;* and *In Re Empire Granite Co.* In each, the court set aside the sum of the tax lien and from it paid administration and wage claims, with the excess then being turned over to the tax lienor. On this score the statute is clear. Where the statutory expression fails is in the priority treatment of remaining claims. But reference to the above noted cases reveals a policy whereby subsequent indefeasible liens are thereafter satisfied before any further participation in the estate by the tax lienor.

To illustrate the treatment accorded by statute, we offer the following example. Assume the estate after sale of the physical assets (discounting the cost of sale) totals

$150,000; that the state's tax lien is for $48,000; that the York-Elgin lien arising from the perfected security interest amounts to $280,000 and that administration expenses run $25,000 and wage claims, $3,000. Distribution under section 67(c)(3) would be as follows:

—the amount of the tax lien—$48,000—would be set aside, and from this the $28,000 in section 64(a)(1) and (2) administration and wage claims would first be paid and the remaining $20,000 turned over to the state.

—thereafter, the remaining assets in the estate—$102,000—would be paid over to York-Elgin.

This contemplated result is entirely consistent with the language of section 67(c)(3) if we read its last sentence to *limit* the sum payable to the State to the difference between the amount of the lien and section 64(a)(1) and (2) claims. And such a construction is consistent with the thrust and intendment of the provision. As the court in *In Re Jordan v. Hamlett*, observed:

The subordination statute makes no change in priority as between liens, but merely defers the payment of specified liens to the extent of satisfying the specified unsecured claims. There is nothing in the statute requiring subordination of the tax liens to the liens of judgment creditors which are later in time and junior in right . . . [T]he tax liens, prior in time and superior in right to the judgment liens are entitled to payment on the basis of first in time, first in right just as in any nonbankruptcy proceeding, except to the extent that amounts payable on the tax liens may be required to pay costs of administration [and priority wage claims]. *Id.* 312 F.2d at 124.

The section attempts a resolution that gives effect to both non-bankruptcy and bankruptcy law. It gives the tax lienor the amount to which it is entitled under the bankruptcy law, and to priority claimants under section 64(a)(1) and (2), an amount to which they are entitled by virtue of the subordination feature. And at the same time, it permits payment to the holder of an indefeasible lien in an amount to which he would have otherwise been entitled had there been no adjudication in bankruptcy. It serves to penalize the inaction of the State, and acts to protect against the accumulation of nonpossessory liens.

The decision of the bankruptcy court is AFFIRMED.