UNITED STATES of America

v.

James Sutton REGAN, Charles M. Zarzecki, Jack Z. Rabinowitz, Paul Berkman, Steven Barry Smotrich, Bruce Lee Newberg, Defendants.

No. S 88 Cr. 517 (RLC).

United States District Court,
S.D. New York.

May 4, 1989.
As Amended May 18, 1989.

**630**

Benito Romano, U.S. Atty., S.D.N.Y., New York City (Mark C. Hansen, Neil Cartusciello and Peter G.A. Safirstein, Asst. U.S. Attys., of counsel), for U.S.

Lowenstein Sandler Kohl Fisher & Boylan, Roseland, N.J. (Theodore V. Wells, of counsel), for defendant Regan.

Grand & Ostrow, New York City (Paul Grand, of counsel), for defendant Zarzecki.

Robert Hill Schwartz, P.C., New York City (Robert Hill Schwartz, of counsel), for defendant Rabinowitz.

Robinson Wayne & LaSala, Newark, N.J. (John D. Arseneault, of counsel), for defendant Berkman.

Hayden, Perle and Silber, New York City (Alan Silber, of counsel), for defendant Smotrich.

Gerald B. Lefcourt, P.C., New York City (Gerald B. Lefcourt, of counsel), for defendant Newberg.

Goldman & Hafetz, New York City (Frederick P. Hafetz, of counsel), for defendant Newberg.

## AMENDED OPINION

ROBERT L. CARTER, District Judge.

Defendants have been charged in a sixty-eight count indictment with conspiracy,[1] racketeering conspiracy and participation in a racketeering enterprise (the "RICO" charges),[2] mail and wire fraud,[3] securities fraud,[4] and subscribing to and aiding and assisting in the preparation and presentation of false and fraudulent tax returns.[5] In connection with the RICO charges, forfeiture is sought of all interests of the defendants in the alleged criminal enterprise and all proceeds of the defendants' alleged racketeering activity.[6]

Defendants have moved for dismissal of most of these charges on both statutory and constitutional grounds. First, they claim they had no statutory duty to keep the records they are charged with conspiring to falsify. Second, they claim that the government's factual allegations fail to state all of the necessary elements of mail and wire fraud. Finally, they claim that their constitutional right to fair notice that their conduct under the due process clause has been violated. Defendant Steven Smotrich has additionally moved for severance of his trial from that of his co-defendants.

*Background*

All of the defendants except Bruce Newberg are general partners or executives in Princeton/Newport Partners, L.P. ("PNP"), an investment firm with offices in Princeton, New Jersey and Newport Beach,

---

**1.** The first count alleges that the defendants conspired to commit the following offenses: subscribing to and aiding and assisting in the preparation of false and fraudulent tax returns in violation of 26 U.S.C. 7206(1)—(2); securities fraud in violation of 15 U.S.C. §§ 77q(a), 77x, 78j(b), 78ff and 17 C.F.R. 240.10b–5; mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343; and causing a registered broker-dealer to make and keep false books and records in violation of 15 U.S.C. §§ 78q(a), 78ff and 17 C.F.R. §§ 240.17(a)(3)—(4).

**2.** 18 U.S.C. §§ 2, 1962(c)—(d).

**3.** 18 U.S.C. §§ 1341, 1343, 2.

**4.** 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b–5, 18 U.S.C. § 2.

**5.** 26 U.S.C. 7206(1)—(2).

**6.** 18 U.S.C. § 1963.

California. At all times relevant to the indictment, Defendant Newberg was a trader in the High Yield and Convertible Bond Department of Drexel Burnham Lambert, Inc. ("Drexel") in Beverly Hills, California.

The charges are based on alleged criminal conduct beginning in or about June, 1984, in connection with three types of securities transactions. The first are so-called "tax trades" in which defendants allegedly engaged in a pattern of sham purchases and sales of securities in order to permit PNP to claim false short term capital loss deductions for federal income tax purposes.

Specifically, it is alleged that defendants arranged for PNP to sell securities subject to secret repurchase agreements which set the repurchase price for the securities without regard to the market value of the securities at the time the repurchase was effected. The alleged purpose of this scheme was to permit PNP to retain effective economic ownership of the securities while appearing to sell them for tax purposes. The tax advantage to PNP was that the short-term capital losses, seemingly incurred as a result of the sale of the securities, could be used to offset short-term capital gains that would otherwise be taxable as ordinary income. The government alleges that defendants' goal was to defraud the United States of income tax revenue and to defraud the limited partners of PNP of truthful information about the amount and legality of the partnership's capital gains and losses. In connection with these alleged illegal acts, each of the defendants is charged with mail and wire fraud and with subscribing to and/or aiding in the preparation of false tax returns.

The second type of securities transaction the government charges was illegal involved Drexel's alleged "parking" of preferred stock of Mattel, Inc. ("Mattel") with PNP. It is alleged that defendants arranged for Drexel to sell Mattel stock to PNP subject to secret repurchase agreements which set the repurchase price for the stock irrespective of changes in its price. It is further alleged that defendants arranged for PNP to purchase additional shares of Mattel stock subject to a secret agreement that any gain or loss on the position would belong to Drexel. The alleged purpose of this scheme was to enable Drexel to retain effective economic ownership of the Mattel stock in violation of a recapitalization agreement that Drexel had entered with Mattel and a group of investors organized by Warburg, Pincus, L.P. that included Drexel (the "Warburg investors group"). The government claims that defendants thereby defrauded Mattel, other members of the Warburg investors group, and other purchasers of Mattel securities. The government also claims that the United States was a contingent victim of the criminal activity. Each of the defendants is charged with mail and wire fraud in connection with these transactions.

The third type of securities transaction cited in the indictment involves an alleged effort to manipulate the market price of C.O.M.B. Co. ("COMB") common stock. It is alleged that defendants arranged to have PNP sell blocks of COMB stock in an effort to drive its price down temporarily without informing either COMB or purchasers of the stock of the attempted manipulation. The alleged goal of this plan was to mislead COMB regarding the value of its securities in order to affect the outcome of a meeting at which key terms were to be set for an issue of COMB convertible bonds that Drexel was underwriting. The government claims that defendants' objective was to defraud both COMB and purchasers of COMB securities. Three of the defendants are charged with wire fraud and securities fraud in connection with this alleged scheme.

## The Records Charge

Defendants contend that the parts of Count One that allege a conspiracy to "caus[e] a registered broker-dealer to make and keep false books and records, in violation of Title 15, United States Code, §§ 78q(a) and 78ff, and Title 17, Code of Federal Regulations, §§ 240.17(a)(3) and 240.17(a)(4) must be stricken, because the relevant financial records accurately and truthfully record all the transactions that

occurred." Moreover, defendants add, federal law did not require the financial recordkeeping of repurchase agreements at the time defendants executed their repurchase agreements.

Defendants' arguments are not persuasive. To be sure, the financial records of Drexel may accurately reflect both the actual sale and repurchase of defendants' securities, but these records fail to reveal the alleged agreement to repurchase the securities made at the time of sale. The crime for which the government charges the defendants does not concern the inaccurate recordkeeping of the actual sale and repurchase transactions, but rather, the omission of the repurchase agreements from Drexel's bookeeping and records.

■ Moreover, federal law did require registered broker-dealers to keep records of repurchase agreements at the relevant times covered by the indictment, notwithstanding defendants' emphasis on the SEC release of July 25, 1987. Rules and Regulations of Securities and Exchange Commission, Rel. No. 34—24553, 52 FR 2229501 (July 25, 1987). Defendants contend that the July 25, 1987 SEC release established for the first time the requirement for registered broker-dealers to keep records of repurchase agreements and that, therefore, federal law did not require the recordkeeping of repurchase agreements before that date.

A careful reading of the SEC release, however, undermines defendants' argument. The SEC release does not establish a new requirement of general recordkeeping for repurchase agreements; instead, it establishes special recordkeeping requirements for repurchase agreements in addition to the prior recordkeeping requirements already in place. The SEC release states that the proposed amendments to Rule 17a–3 will "specifically require a broker-dealer to: (i) maintain a separate ledger reflecting the assets and liabilities resulting from repo reverse repo transactions ...; (ii) record securities subject to repos

and reverse repos on the securities record; and (iii) maintain copies of confirmations that it sends out with regard to repurchase transactions." Rules and Regulations of Securities and Exchange Commission, Rel. No. 34—24553, *supra.*

Before the July 25, 1987 SEC release, the Code of Federal Regulations required registered broker-dealers to keep, *inter alia,* the following records:

(1) Blotters (or other records of original entry) containing an itemized daily record of all purchases and sales of securities....

(3) Ledger accounts (or other records) itemizing separately as to each cash and margin account of every customer and of such member ... all purchases [and] sales ... of securities....

(8) Copies of confirmations of all purchases and sales of securities and copies of notices of all other debts and credits for securities....

17 C.F.R. § 240.17a–3(a)(1), (3), (8). The term "purchase" included any contract to purchase securities, *see* 15 U.S.C. § 78c(13) ("The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire."), and the term "sale" included any contract to sell securities. *See* 15 U.S.C. § 78c(14) ("The terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of.").[7] Thus, defendants cannot contend that federal law did not require Drexel to keep records of their repurchase agreements at the time defendants made these agreements.

### *The Mail and Wire Fraud Charges*

In *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Court held that the mail fraud statute is "limited in scope to the protection of property rights," and does not reach "schemes to defraud citizens of their intangible rights to honest and impartial government." *Id.* at 355, 107 S.Ct. at 2879. This rule was further elaborated in *Carpenter v. United States,* 484 U.S. 19, 108 S.Ct.

---

**7.** Although the purpose of these definitional statutes is ostensibly to define the scope of terms used in the Securities Exchange Act, these statutes also apply to the Code of Federal Regulations. *See* 17 C.F.R. § 240.0–1(a)(2), (b).

316, 98 L.Ed.2d 275 (1987), in which the Court made it clear that *"McNally* did not limit the scope of [the mail fraud statute] to tangible as distinguished from intangible property rights." *Id.* at ——, 108 S.Ct. at 320. Specifically, confidential business information was held to be protected, because courts have long recognized such information to be property. On the other hand, a newspaper's contractual right to "honest and faithful service" on the part of a reporter was held to be "too ethereal in itself to fall within the protection of the mail fraud statute." *Id.* Defendants argue that the application of these principles to the instant case requires dismissal of all mail and wire fraud counts in the indictment.

*The Tax Trades*

Defendants argue that no plan to defraud the United States of money or property can be alleged in connection with their alleged tax trading scheme, because the federal government has no property right in a taxpayer's income until a notice of tax deficiency is sent to the taxpayer.

■ We were not persuaded by this argument when made previously, *United States v. Regan,* 699 F.Supp. 36, 40 (S.D.N.Y.1988) (Carter, J.), and we are not persuaded now. An attempt fraudulently to hide taxable income from the government in order to pay less taxes than is legally due is a scheme to defraud the government of money. Defendants' effort to obscure this commonsense reality by focusing their argument on the administrative steps which the Internal Revenue Service must follow to collect taxes due is quite frankly a waste of time.

A taxpayer's income tax liability arises because the taxpayer receives taxable income, not because the government issues a deficiency notice. Section 1 of subtitle A of the Internal Revenue Code declares that, "[t]here is *hereby imposed* on the taxable income of [specified categories of taxpayers] a tax determined in accordance with the following table." 26 U.S.C. § 1 (emphasis added). A tax "deficiency" is defined as "the amount by which the tax *imposed by subtitle A* ..." exceeds the

amount previously calculated as due. 26 U.S.C. § 6211(a) (emphasis added).

The language of the statute is clear and straightforward. Accrual of income tax liability does not await the issuance of a deficiency notice pursuant to § 6212. It is imposed directly by the statute. To be sure, tax payments may not be immediately due upon an individual's receipt of taxable income. The actual extent of the liability may not even be determinable until the close of the tax year, and an administrative labyrinth may have to be traversed before the government can demand payment. However, the government's property interest in these payments arises with the receipt of taxable income. *Macatee, Inc. v. United States,* 214 F.2d 717, 720 (5th Cir. 1954) ("liability for income taxes arises, and in some sense it may be said that they accrue, at the time the gains, profits, and income passed into the hands of the recipient") (quoting *United States v. Proctor,* 286 F. 272, 272–74 (S.D.Tex.1922)); *cf. Bull v. United States,* 295 U.S. 247, 259–60, 55 S.Ct. 695, 699–700, 79 L.Ed. 1421 (1935); *Jenkins v. Smith,* 99 F.2d 827, 828 (2d Cir.1938); *Damsky v. Zavatt,* 289 F.2d 46, 49–51 (2d Cir.1961); *United States v. National Acceptance Co. of America,* 603 F.Supp. 1351, 1353 (E.D.Mich.1985); *United States v. Jersey Shore State Bank,* 781 F.2d 974, 979–81 (3rd Cir.1986), *aff'd,* 479 U.S. 442, 107 S.Ct. 782, 93 L.Ed.2d 800 (1987).

This analysis fully accords with the Second Circuit's recent decision in *United States v. Porcelli,* 865 F.2d 1352 (2d Cir. 1989). The *Porcelli* court held that a state's interest in uncollected and unpaid sales taxes is property for purposes of the mail and wire fraud statutes. Under New York law, the state's property interest arises when a taxable sale is made. At that point, the vendor is liable for payment of the tax. Whether the vender actually collects the tax from the purchaser, in respect of his tax liability, is irrelevant. Thus, a plot by a vendor to underreport taxable sales is a scheme to defraud the state of money or property.

Defendants' effort to distinguish *Porcelli* is unpersuasive. They contend that New York's interest in unpaid sales taxes is different from the federal government's interest in unpaid income taxes, because the federal government cannot obtain judicial enforcement of its interest until after a notice of deficiency has been mailed. However, the same limitation applies to New York's interest in unpaid sales taxes. The New York Tax Law includes a notice requirement applicable to sales tax determinations that is functionally equivalent to the notice of deficiency of the Internal Revenue Code. *Compare* N.Y. Tax Law §§ 1138, 1141 (McKinney 1987) *with* 26 U.S.C. §§ 6212, 6213. New York can obtain a lien securing its property interest in unpaid sales taxes only after notice and an opportunity to be heard has been extended to an allegedly delinquent taxpayer in accord with the requirements of § 1138 of the Tax Law. *Matter of United Casket Co.*, 449 F.Supp. 261, 265 n. 3 (E.D.N.Y. 1978), *aff'd* 608 F.2d 1370, *cert. denied*, 444 U.S. 967, 100 S.Ct. 456, 62 L.Ed.2d 380 (1979); *Arthur Treacher's Fish & Chips v. New York State Tax Comm'n*, 69 A.D.2d 550, 419 N.Y.S.2d 768, 773 (3rd Dept.1979). Thus, New York stands in exactly the same posture as the federal government with respect to the realization of its property interest in unpaid taxes.

It is possible to distinguish *Porcelli*, however, on the ground that it applied the mail fraud statute to a scheme to evade state rather than federal taxes. This distinction could be significant in light of *United States v. Henderson*, 386 F.Supp. 1048 (S.D.N.Y.1974) (Weinfeld, J.).

In *Henderson*, the court dismissed the mail fraud counts of an indictment in which the defendant was also charged with federal income tax evasion based on the same factual allegations. Read narrowly, *Henderson* is distinguishable from the instant case because defendants have not been charged with both mail fraud and tax evasion for the same acts.

However, Judge Weinfeld's reasoning went beyond a rejection of the pyramiding of charges in tax evasion cases. He took the position that the mail fraud statute "was not intended by Congress to apply to a scheme to defraud the United States in an attempt to evade the payment of taxes." *Id.* at 1052. Acceptance of this broader holding would require dismissal of mail fraud counts in the instant indictment that rest on factual allegations indictable under the Internal Revenue Code.[8]

The government did not appeal the *Henderson* decision, and the Second Circuit has never expressly disapproved the holding, but, except for its criticism of the practice of pyramiding charges, there is little support for the decision in subsequently reported cases. Efforts to rely on Judge Weinfeld's broad claim that the mail fraud statute was not intended to reach the crime of tax evasion have been decisively rejected by the Second Circuit in cases involving distinguishable fact patterns. *See United States v. Mangan*, 575 F.2d 32, 49 (2d Cir.1978), *cert. denied*, 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978) (scheme did not involve defendants' own tax liabilities); *United States v. DeFiore*, 720 F.2d 757, 761 (2d Cir.1983) (scheme involved state rather than federal tax liabilities); *Porcelli*, at 1358; *United States v. Reed*, 639 F.2d 896, 904–05 (2d Cir.1981).

Similarly, Judge Weinfeld's approach has been disapproved by this court. *See United States v. Standard Drywall Corp.*, 617 F.Supp. 1283, 1295–96 (S.D.N.Y.1985) (Maletz, S.J.) (citing rejection of *Henderson* by other courts and noting that "[a]lthough never rejected by the Second Circuit, *Henderson* has not carried the day in that court either."); *United States v. Abrahams*, 493 F.Supp. 296, 302–04 (S.D.N.Y. 1980) (Conner, J.) (rejecting argument that defendant should have been prosecuted under the Commodity Futures Trading Commission Act instead of mail and wire fraud statutes); *but see United States v. Gallant*, 570 F.Supp. 303, 309 (S.D.N.Y.1983)

---

**8.** The court expresses no opinion as to whether the defendants' alleged tax trading scheme would be indictable under the Internal Revenue Code, nor whether the government's allegations regarding that scheme would be totally encompassed by such an indictment.

(Edelstein, J.) (citing *Henderson* in support of decision that defendants could not be prosecuted for violations of both copyright laws and mail fraud statute).

Outside the Second Circuit, *Henderson* has been rejected or distinguished in virtually all of the reported cases that cite the opinion. *See e.g., United States v. Miller,* 545 F.2d 1204, 1216 (9th Cir.1976), *cert. denied* 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed. 2d 774 (1977) (rejecting *Henderson* in case involving prosecution for federal tax evasion and mail fraud); *United States v. Shermetaro,* 625 F.2d 104, 110–11 (6th Cir. 1980) (rejecting *Henderson* in case involving joint prosecution for conspiracy to defraud the United States and federal tax evasion); *United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1187 n. 13 (4th Cir.1982) (rejecting *Henderson* in case involving prosecution for mail and wire fraud and for making false claims to the United States government); *United States v. Weatherspoon,* 581 F.2d 595, 599–600 (7th Cir.1978) (distinguishing *Henderson* in case involving prosecution for mail fraud and for making false statements to the United States government); *United States v. Steinmetz,* 643 F.Supp. 537 (M.D.Pa.1986) (refusing to follow *Henderson* in case involving prosecution for conspiracy to defraud the United States by obstructing the collection of income taxes).

Judge Weinfeld based his decision in part on the fact that his own research had uncovered no cases in which an attempt to defraud the government had been held to constitute mail fraud except where the scheme involved the fraudulent purchase or sale of commodities or services. *Henderson,* 386 F.Supp. at 1052, 1053 n. 18. The above cited opinions removed absence of decisions on point as a basis for *Henderson.*

The second argument on which the *Henderson* decision rests concerns the impermissible pyramiding of charges. The Second Circuit has also "expressed misgivings over the government's use of the mail fraud statute as a basis for additional counts in an indictment the gravamen of which was the violation of other federal criminal statutes," *Mangan* 575 F.2d at 49 (citing *United States v. Dixon,* 536 F.2d 1388, 1398–1401 (2d Cir.1976)), but that misgiving provides slim support for Judge Weinfeld's broad holding that the mail fraud statute was not intended to reach a scheme to evade the payment of taxes. In any case, there is no pyramiding of charges in the instant case.

The third argument on which the *Henderson* decision rests is that the mail fraud statute was intended for use only where specialized legislation has not yet been developed to deal with a particular species of fraud. If this is so, a very large portion of mail and wire fraud case law is in error. As former Chief Justice Burger noted in the very dissent that Judge Weinfeld cited in support of his holding in *Henderson,* "[t]he mail fraud statute continues to remain an important tool in prosecuting frauds in those areas where legislation has been passed more directly addressing the fraudulent conduct." *United States v. Maze,* 414 U.S. 395, 406, 94 S.Ct. 645, 651, 38 L.Ed.2d 603 (1974) (Burger, C.J., dissenting); *see also Abrahams,* 493 F.Supp. at 302–03. In light of the generally permissive attitude adopted by the courts in allowing the mail and wire fraud statutes to be used to prosecute a wide variety of crimes also covered by more specific statutes, a more persuasive rationale than that provided by the *Henderson* decision is needed to explain why such reliance should not be permitted in prosecuting schemes to evade the payment of federal income taxes. In our analysis of the viability of these charges, we place no reliance on *Henderson.* Defendants' claim that they cannot be indicted under the mail and wire fraud statutes for attempting to defraud the United States of income tax revenue is rejected.

Defendants, however, are on firmer ground in challenging the adequacy of the government's allegation that the limited partners of PNP were defrauded of their right to receive truthful information about the amount and legality of the partnership's capital gains and losses. The government argues that the limited partners had a right to this information pursu-

ant to their partnership agreement. Be that as it may, the information withheld must constitute property to satisfy the *McNally* rule.

The only authority cited by the government to support its characterization of the information as property is a provision of the Delaware Limited Partnership Act which declares that "[a] limited partner's interest in the partnership is personal property."[9] Del.Code Ann. tit. 6, § 1718 (1975). This is insufficient. A partnership interest may be property without the rights to which the interest entitles a partner being property. An ownership interest in a newspaper is certainly property, but that is not enough to transform the owners' contractual right to the honest and faithful service of his employees into property. *See Carpenter*, 484 U.S. at ——, 108 S.Ct. at 320.

■ The limited partners may indeed have had a contractual right to receive truthful information of the type described in paragraph 11 of the indictment, but like the right of "the citizens and government of Kentucky ... to have the Commonwealth's affairs conducted honestly," *McNally*, 483 U.S. at 352, 107 S.Ct. at 2877, this right creates no property interest in the information allegedly withheld from them. Thus, the factual allegations made in paragraph 11 are insufficient to support a charge of mail or wire fraud. The mail and wire fraud counts involving the tax trades must therefore rest solely on the allegation that defendants schemed to defraud the United States of income tax revenue.

### The Mattel Transaction

Defendants also claim that the government has failed to allege a scheme to deprive anyone of money or property in connection with the Mattel transaction.

The government alleges that the property Mattel was defrauded of was part of the consideration it paid to Drexel for the latter's services in connection with Mattel's recapitalization transaction with the War-

burg investor group in the spring of 1984. The government's theory, as I understand it, is as follows: Mattel paid a fee and other consideration for Drexel's participation in a transaction which limited Drexel's right to acquire additional Mattel securities. This limitation was valuable to Mattel because it reduced the risk that Mattel would lose its net operating loss ("NOL") for tax purposes. Mattel would have declined to enter the agreement with Drexel or would have been unwilling to pay as much for Drexel's services if Drexel had not agreed to the limitation or if the amount of stock Drexel was permitted to hold under the agreement had been increased, since this would have heightened the risk that Mattel would lose its NOL for tax purposes. Thus, by conspiring to hide the fact that Drexel was retaining effective ownership of a larger block of Mattel securities than the recapitalization agreement allowed, defendants schemed to defraud Mattel of the full value of the services it was purchasing from Drexel.

■ The problem with this theory is that the purpose of the alleged scheme was not to defraud Mattel of money by inducing it to contract for services which defendants knew would not be provided. That would be garden variety mail fraud. *See United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir.1970). Instead, defendants have been charged with scheming to hide Drexel's breach of its agreement with Mattel so as to reap the benefits therefrom. Mattel may have had a right to Drexel's performance of its obligations under this agreement, but a right to honest and faithful performance of contractual obligations is not property for purposes of the mail and wire fraud statutes. *Carpenter*, 484 U.S. at ——, 108 S.Ct. at 320.

The government's attempt to compensate for this deficiency by pointing out that a necessary consequence of defendants' actions was to deprive Mattel of the full value of the services it purchased is unavailing. However deceitful a scheme may

---

**9.** The partnership agreement contains a choice of law clause which indicates that it is to be governed by and construed in accordance with Delaware law.

be, it does not violate the mail or wire fraud statutes unless some actual harm or injury to its victims is contemplated or intended. *Regent Office Supply Co.,* 421 F.2d at 1180–81; *United States v. Starr,* 816 F.2d 94, 98 (2d Cir.1987). After *McNally* and *Carpenter,* the harm or injury contemplated or intended must be a monetary or property interest of the victim.[10]

It is not enough that the scheme be designed to deprive its victims of an intangible right for which money or property has been paid. The money or property deprivation must be a goal of the plot, not just an inadvertent consequence of it. This is implicit in the *McNally* and *Carpenter* decisions. When the Wall Street Journal employed R. Foster Winans, one of the defendants in the *Carpenter* case, it obtained a contractual right to his honest and faithful service. Money was paid to obtain this right, and Winans scheme undoubtedly deprived the newspaper of the full value of the services it had purchased. Surely the Wall Street Journal was deprived of that increment of Winans salary that it paid for his honesty and loyalty.[11] Nonetheless, the Court held that Winans's conviction could not be based solely on his failure to perform his contractual obligation to serve his employer honestly and faithfully. *Carpenter,* 484 U.S. at ——, 108 S.Ct. at 320.

This decision would be rendered meaningless if it were interpreted to allow an employee's deceitful breach of duty to be prosecuted as mail or wire fraud merely by alleging that the defendant's employer was thereby deprived of the full value of any wages paid to the defendant during the period of the deceit. In that case, all that would be required to prosecute schemes to defraud persons of their intangible rights would be cleverly worded indictments reciting some tangible consideration paid by the victims of the fraud for the intangible rights of which they were defrauded.

It seems more reasonable to interpret *McNally* and *Carpenter* as requiring mail and wire fraud indictments to allege that the persons charged intended to deprive their victims of money or property, not just that such a deprivation could be theoretically characterized as a necessary consequence of their scheme.

Based on this understanding of the requirements for a viable mail or wire fraud prosecution, the government's contention that the alleged Mattel "parks" defrauded the Warburg investor's group and others who acquired Mattel securities of part of the value of their acquisitions fails to allege mail and wire fraud. The government's theory with regard to this deprivation is based on its characterization of Mattel's NOL as a valuable asset because it could reduce the firm's future tax liabilities. Any increase in the likelihood that the NOL would be lost for tax purposes would therefore have a negative effect on the value of Mattel securities. Thus, the government reasons that purchasers of Mattel securities were defrauded of part of the value of their purchases, even though no allegation is made that they lost any money or were intended to lose any money as a result of the scheme.

This theory is similar to the one according to which the government ascribes a property deprivation to Mattel. The purchasers of Mattel securities got less than

---

**10.** Support for this interpretation of *McNally* can be garnered from dicta in *United States v. Evans,* 844 F.2d 36, 38–40 (2d Cir.1988) (expressing approval of decision by trial court that *"McNally* requires that the defendants have planned that the victim of the deception ... lose money or property."), and from cases which emphasize that *the goal* of a mail or wire fraud scheme must be fraudulent under the statute. *See e.g., United States v. Baldinger,* 838 F.2d 176, 179–80 (6th Cir.1988) (holding that *McNally* and *Carpenter* limit the reach of the mail and wire fraud statutes to schemes that have as their goal the transfer of something of economic value to the defendant); *United States v. Evans,* 844 F.2d 36 (2d Cir.1988) (violation of the mail or wire fraud statutes requires that the goal of the fraudulent scheme be to deprive the party deceived, rather than someone else, of money or property).

**11.** The same analysis can be applied to the *McNally* case, in which one of the defendants was a state official whose receipt of a salary from the public fisc undoubtedly invested the state with a contractual right to his honest and faithful service.

they bargained for and were therefore deprived of part of the value of the consideration they paid for the securities. However, no claim is made that the defendants schemed to induce these purchases, nor that they intended these putative victims to suffer any loss of money or property. Thus, a requisite for violations of the mail or wire fraud statutes is lacking.

The government further claims that the United States was a contingent victim of defendants' actions. If Mattel had lost the use of its NOL for tax purposes, but that fact was hidden from Mattel and the government, the United States would have been defrauded of tax revenues. Once again, however, no claim is made that any such fraud on the government was contemplated or intended by the defendants.

The government's last two theories of how the alleged Mattel parking scheme caused a property deprivation are even more obviously deficient under the *McNally* standard. First, the government claims that the right of other members of the Warburg investors group to Drexel's performance of its obligation to limit its acquisitions of Mattel securities was a property right by virtue of the fact that it limited Drexel's right to acquire property. An option to buy property might be a property right for purposes of the mail and wire fraud statutes, but the government cites no authority for its singular view that the beneficiary of a promise not to acquire property thereby acquires a property right. If A promises B not to acquire Blackacre, B may obtain a contractual right to A's performance, but that right is no more property than the Wall Street Journal's right to Winans' faithful and honest performance of his contractual obligations.

Finally, the government claims that Drexel's knowledge of its secret ownership of Mattel securities was confidential business information, and that Drexel had sold its right to the exclusive use of this information to Mattel. Since confidential business information is property for purposes of the mail and wire fraud statutes, *Carpenter*, 484 U.S. at ——, 108 S.Ct. at 320, the government reasons that Mattel was defrauded of its property interest in the information.

Stated plainly, however, the government claims no more than that Drexel had an obligation to disclose information regarding the defendants' scheme to Mattel and failed to do so. By calling the defendants' knowledge confidential business information, the government dresses its claim in the language of property interests, but the actual character of the claim is unchanged.

Defendants may have defrauded Mattel of an intangible right to accurate information regarding Drexel's holdings of Mattel securities, but this does not properly allege a deprivation of a property interest. The government official who was a defendant in *McNally* was prosecuted on the theory that he had a duty to inform his employer of the kickback scheme in which he was participating, but his failure to disclose the scheme was not deemed to deprive the state of any property interest. The government offers no rationale for distinguishing defendants' failure to disclose their "parking" scheme from the *McNally* defendants' failure to disclose their kickback scheme.

Since none of the government's theories of the Mattel "parks" make out a case of mail or wire fraud, all allegations of mail or wire fraud based on that scheme must be dismissed.

*The COMB Transaction*

██ Some of the government's allegations in connection with the COMB transaction are similarly flawed, but a charge of wire fraud is nonetheless made out. It is alleged that defendants tried to manipulate the price of COMB common stock in order to influence the outcome of a meeting at which the coupon rate and conversion premium for an offering of COMB convertible bonds underwritten by Drexel was to be set. No claim is made that the effort was successful in achieving its goal, but the government alleges that defendants' purpose was to induce COMB fraudulently to agree to an offering coupon rate and/or conversion premium less favorable to COMB than would otherwise have been the case. This would have caused COMB a

monetary detriment while benefiting Drexel by reducing the difficulties it would encounter in selling the securities. Thus, defendants have been charged with scheming to defraud COMB of money or property by engaging in secret market manipulations that would mislead COMB in setting the terms for its offering. That the plan may not have been successful is irrelevant. *Starr,* 816 F.2d at 98. Nor does it matter that the money or property lost by the victim of the scheme would not have flowed directly to defendants. *See Regan* 699 F.Supp. at 39–40.

In their briefs, defendants and the government both concentrate on the issue of whether Drexel and PNP had a duty to disclose its attempted manipulation of COMB stock to various parties. It is not denied that such a duty was owed to COMB, and that is all that matters for purposes of the above analysis. PNP may also have had a duty to disclose its attempted manipulation to purchasers of the COMB common stock that it sold short, but no allegation has been made that defendants contemplated any detriment to these purchasers. Without such an allegation, the government cannot claim that they were victims of the scheme.

*Fair Notice*

Defendants contend that all charges other than the C.O.M.B. counts, the tax counts and the RICO count must be stricken, because defendants did not have "fair notice" that their activities constituted criminal violations. In particular, defendants allege that they did not have "fair notice" with respect to (1) the false books and records charges in Count One, (2) the mail and wire fraud charges based on alleged tax fraud, (3) the mail and wire fraud charges based on the alleged Mattel "park" [12] and (4) the RICO predicate offenses based on alleged tax fraud.

The purpose of the "fair notice" doctrine is to give a person of "ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *United States v. Hariss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954). The relevant test is whether "the law give[s] sufficient warning that men may conduct themselves so as to avoid that which is forbidden, and thus not lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct might be within its scope." *United States v. Herrera,* 584 F.2d 1137, 1149 (2d Cir.1978).

The court finds no fair notice problems in any of the government's charges. In contrast to the statutes in cases where the United States Supreme Court has found problems of fair notice, *see, e.g., United States v. Kozminski,* — U.S. —, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988) (defendants did not have fair notice that psychological coercion constituted "involuntary servitude"); *Papachristou v. Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1971) (Florida vagrancy statute held unconstitutional); *Lanzetta v. New Jersey,* 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939) ("gangster" statute found to be "so vague, indefinite and uncertain that it must be condemned as repugnant to the due process clause of the Fourteenth Amendment"); *United States v. Cohen Grocery Co.,* 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921) (statute prohibited any person from "willfully ... mak[ing] any unjust or unreasonable rate or charge in ... dealing in or with any necessaries"), the statutes involved in the case at bar are straightforward and unambiguously encompass the alleged actions of the defendants.[13]

---

**12.** Since the court has already dismissed the counts related to the Mattel transaction, fair notice with respect to these counts will not be discussed.

**13.** The statutes in cases where the United States Supreme Court has found no problems of fair notice have arguably been more vague than the statutes of which defendants complain. *See, e.g., United States v. Powell,* 423 U.S. 87, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975) (statute banning the mailing of "firearms capable of being concealed on the person" found constitutional); *Smith v. United States,* 431 U.S. 291, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977) (federal obscenity statute found constitutional, notwithstanding lack of specific criteria defining what constitutes prohibited obscenity); *Sproles v. Binford,* 286 U.S. 374, 52 S.Ct. 581, 76 L.Ed. 1167 (1932) (statute providing that certain oversized or heavy loads must be transported by the "shortest practicable route" found constitutional).

First, the plain wording of the Securities and Exchange Act, 15 U.S.C. §§ 78c(13), (14), 78q(a), and Rule 17a–3, 17 C.F.R. § 240.17a–3,[14] disposes of defendants' fair notice claims with respect to the recordkeeping counts. This legislation, enacted into law prior to defendants' alleged criminal activities, provided the requisite notice, as indicated earlier in this opinion.[15]

Second, the language of the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, similarly disposes of defendants' claim of lack of fair notice with respect to the mail and wire fraud counts based on federal tax fraud. Section 1341 states categorically that no one may use the mail to perpetrate a fraud;[16] section 1343 states the same for use of the wires.[17] The government charges defendants with precisely these crimes, the perpetration of fraud through the use of the mail and wires. Defendants argue that *Henderson* precludes fair notice of the applicability of the mail and wire fraud statutes to federal tax fraud. Defendants' reliance on *Henderson*, however, is misplaced. The court has already indicated above why *Henderson* is not persuasive authority for the inapplicability of the mail fraud statute to defendants' alleged activities. *See supra* pp. 634–35. Additionally, the overwhelming majority of courts that have construed the significance of *Henderson* have rejected its doctrine and/or its reasoning, providing notice that the mail fraud statute may be used more widely than *Henderson* permitted. *See supra* pp. 634–35. Particularly since the Second Circuit has explicitly refrained from affirming *Henderson, see e.g., Mangan*, 575 F.2d at 49 ("[w]e … leave the question whether this court would follow *Henderson* on its facts to another day"), this chorus of judicial opinions should have put defendants on notice that the government could charge them under the mail fraud statute. Moreover, the most relevant court decisions, for the purpose of providing notice to defendants about the scope of the mail fraud statute, would not have been those of the Second Circuit, but rather, those of the Ninth and Third Circuits, where defendants conducted much of their business. The case law in both of these circuits rejected *Henderson* before defendants' alleged criminal activities and construed the scope of the mail fraud statute broadly. *See United States v. Miller*, 545 F.2d 1204, 1216 n. 17 (9th Cir.1976) ("[w]e reject the holding in *Henderson*"); *United States v. LaBar*, 506 F.Supp. 1267, 1274 (E.D.Pa.1981) (rejecting *Henderson;* mail fraud statute may be used to prosecute fraud against United States, even though more relevant

---

**14.** For the text of these statutes, see *supra* p. 632.

**15.** Defendants' argument that the SEC required the recordkeeping of repurchase agreements only after its July 1987 release has been rejected above. *See supra* pp. 631–32.

**16.** Title 18, U.S.C., Section 1341 reads as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or deliv-

ered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1000 or imprisoned not more than five years, or both.

**17.** Title 18, U.S.C., Section 1343 reads as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1000 or imprisoned not more than five years, or both.

statute could be used).[18]

■ Third, the RICO statutes explicitly make mail and wire fraud predicate acts for RICO prosecutions. 18 U.S.C. § 1961(1). Defendants, therefore, cannot argue lack of fair notice that their alleged criminal activities constituted predicate acts for a RICO prosecution.

### Severance

Defendant Smotrich moves for severance under Rule 14, F.R.Crim.P., contending that a joint trial will substantially prejudice him. In essence, the defendant contends that the quality and weight of the evidence to be introduced against him at trial will be different from the quality and weight of the evidence to be introduced against his codefendants, as he played a relatively minor role in the alleged criminal activities.

■ Smotrich bears a "difficult burden of showing that the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." *United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir.1984). The court finds that he has not overcome this presumption against severance.

Smotrich's claim that there will be a paucity of evidence involving him rings hollow, since the government has indicted him under 56 of the 68 counts brought against all defendants. Neither does the court have any reason to question, when contemplating the complexity of the case and the need to compartmentalize the evidence, the "almost invariable assumption of the law that jurors follow their instructions," *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987) (citation omitted).

Smotrich may have been a small cog, with limited authority and decisionmaking power, in the totality of the alleged criminal activities being prosecuted, but " 'dif-ferences in degree of guilt and possible degree of notoriety' ... do not require that there be separate trials." *United States v. Neresian*, 824 F.2d 1294, 1304 (2d Cir.1987) (quoting *United States v. Aloi*, 511 F.2d 585, 598 (2d Cir.), *cert. denied*, 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975)); *accord United States v. Chang An–Lo*, 851 F.2d 547, 557 (2d Cir.1988) (quoting *United States v. Carson*, 702 F.2d 351, 366—67 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983)) ("differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient ground for separate trials").

Neither would defendant Smotrich's lesser participation in the alleged crimes warrant severance. *See United States v. Ebner*, 782 F.2d 1120, 1127 (2d Cir.1986) (severance properly denied despite moving defendant's more limited participation in conspiracy); *United States v. Vega*, 458 F.2d 1234, 1236 (2d Cir.1972) (purportedly "minor" participants in large conspiracy properly denied a severance).

The court, therefore, denies defendant Smotrich's motion for severance.

### Conclusion

All of defendants' motions are denied except for the following: defendants' motion to dismiss counts 49—51 (alleging mail and wire fraud in connection with the Mattel transaction) and to strike paragraph 48 of count 2 (Racketeering Act Nine) is granted. All references to paragraphs 11 and 18—23 in the mail and wire fraud counts must be stricken, and the superseding indictment must be redacted to give effect to this opinion.

IT IS SO ORDERED.

---

18. The government smugly dismisses the *Henderson* argument too casually, for the argument does not "border on the absurd." To be sure, Judge Weinfeld deals with the issue of preemption, not fair notice, but the issue of preemption is relevant to fair notice. If one statute preempts another, the government may not bring charges under the latter. To the ex-tent that a case indicates that one statute preempts another, a person of "ordinary intelligence" may correctly presume that the government may not bring charges under the preempted statute. If the government later brings charges under the preempted statute, the defendant has not received fair notice.