## APPEAL OF HAROLD B. CLARK.

Docket No. 1707. Submitted May 11, 1925. Decided September 9, 1925.

> Prior to the taking effect of the Revenue Act of 1921 the taxpayer sold three blocks of securities at less than cost and immediately repurchased them. Under the circumstances and conditions of the transactions, *held*, that two of them constituted *bona fide* sales and resulted in deductible losses, but the third did not.

*Percy W. Crane, Esq.*, for the taxpayer.
*E. C. Lake, Esq.*, for the Commissioner.

Before IVINS, MARQUETTE, and MORRIS.

This appeal is from the determination of a deficiency in income tax for the year 1921 in the amount of $3,532.26.

The question is whether the taxpayer sustained a loss in the sale of securities prior to the passage of the Revenue Act of 1921.

From the evidence submitted by depositions and exhibits the Board makes the following

FINDINGS OF FACT.

The taxpayer is a resident of New Canaan, Conn., and in 1921 was a member of the firm of White, Weld & Co., dealers in investment securities, having an office in New York City.

On the morning of November 23, 1921, the taxpayer realized that the Revenue Act of 1921 had passed the Senate and House and awaited signature by the President and knew that after its approval no sales of securities could be made to effect losses as deductions on tax returns if the same securities were bought back within 30 days after a sale. He called one Taylor, an employee, into his office and instructed him to sell the following securities at the prevailing price in the market:

190 shares of common stock in the McCall Corporation.

881 shares of common B stock in the Canadian Connecticut Mills.

54 shares of common B stock in the Connecticut Mills Corporation.

All three were inactive securities not dealt in upon any stock exchange.

Taylor telephoned Charles H. Jones & Co., brokers and investment dealers, and arranged a sale of the 190 shares of McCall Corporation stock at the bid market price of $9⅞ per share. He then telephoned the Columbia Trust Co., of Newark, which he knew was interested in the Canadian Connecticut Cotton Mills stock and arranged a sale of the 881 shares of such stock at $3 per share. The taxpayer was a director in the Columbia Trust Co. Taylor knew that another employee in White, Weld & Co., one Miller, owned some stock in the Connecticut Mills Corporation, and he approached Miller with the proposition that Clark would sell to him the 54 shares at $5 per share. Taylor knew that the taxpayer was effecting all of the sales for the sole purpose of taking losses on his tax returns and that he hoped to buy all of the stock back after the sales were completed. Miller knew that the sale to him was under the same situation.

After arranging the sales, Taylor reported to the taxpayer and was instructed to buy the same stocks back, it being left to Taylor to determine when the repurchase should be made. Taylor realized that the market might change, and, not desiring to take any chance, carried the repurchases through within an hour after the sales had been effected. The Columbia Trust Co. sold 881 shares of Canadian Connecticut Cotton Mills stock to the taxpayer, through Taylor, at $3 per share. Taylor bought for the taxpayer 190 shares of McCall Corporation stock through Charles H. Jones & Co. at $10 per share, instead of $9⅞, the prior sale price. The 54 shares of stock in Connecticut Mills Corporation were bought back from Miller on the same day at the same price, $5 per share. Miller bought and sold the stock for the purpose of accommodating the taxpayer. All three of the transactions were completed prior to the time of passage of the Revenue Act of 1921.

In all three instances the certificates later delivered to the taxpayer were different from those delivered by him in carrying through the sales.

Actual payments were made between the taxpayer and the Columbia Trust Co. and Charles H. Jones & Co. As to the Miller transactions, however, the matters were adjusted merely by debit and credit entries upon the books of White, Weld & Co. Commissions were charged by White, Weld & Co. against the taxpayer as to all of the sales and against Miller in his sale to the taxpayer.

The taxpayer claimed an aggregate loss in 1921 by reason of the sale of these securities in the amount of $10,935.60. The Commissioner disallowed the losses and determined a deficiency in income tax for the year 1921, amounting to $3,532.26. From that determination the taxpayer duly appealed.

### DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination by the Board will be settled on 10 days' notice, under Rule 50.

### OPINION.

IVINS: The losses should be allowed as to the securities sold to the Columbia Trust Co. and Charles H. Jones & Co. *Appeal of the Pennsylvania Co. for Insurance on Lives and Granting Annuities*, 2 B. T. A. 48; *Appeal of Benjamin T. Britt*, 2 B. T. A. 53.

The transaction with the Columbia Trust Co. was on the border line, but the taxpayer's evidence establishes, *prima facie*, a *bona fide* sale, and no evidence to rebut it has been presented by the Commissioner. The fact that the taxpayer was a director in the trust company may have influenced the resale by it to the taxpayer, but we have nothing on which to base a belief that he knew or expected that the trust company would resell to him without charging him a profit on the transaction.

We are not convinced, however, as to the good faith of the sale to Miller. That transaction rather falls within the category of such situations as are illustrated by *Appeal of W. C. Bradley*, 1 B. T. A. 111; *Appeal of James Dobson*, 1 B. T. A. 1082; and *Appeal of P. B. Fouke*, 2 B. T. A. 219. Miller testified on cross examination as follows:

Q. What was your purpose in buying it? A. My purpose in buying it was the fact that we have transactions of this kind in the office, and Mr. Taylor came to me and asked me if I would buy 54 shares of the stock at $5.00 a share, and I said, Yes, go ahead. That is my recollection of the conversation, something of that kind.

Q. Now, you state that the deal for the 54 shares was closed? A. Correct.

Q. And then when did you sell the 54 shares? A. November 23rrd—I have forgotten the year—1921.

Q. Then the purpose in buying this stock and selling it the same day was to accommodate Mr. Taylor, who had approached you about it? A. Correct.

Q. And you knew what Mr. Taylor's purpose was in asking you to get in the transaction? A. Not necessarily.

Q. Did you have any information about what his purpose was? A. As to this specific transaction, I think not.

Q. It was a practice there in the office to commonly indulge in, handling these matters in this way, wasn't it? A. It was.

Q. What was the purpose? A. What was the purpose of what? ·

Q. Of handling these transactions in this way A. The purpose as I understood it was because of income taxes.

Q. And the sole purpose, so far as you know, was for the purpose of establishing losses for income tax purposes? A. Correct.

It is apparent from this testimony that Miller might be fittingly described as an " accommodation " purchaser, as distinguished from a *bona fide* purchaser. He was familiar with the common and prevalent practice in his business circles of registering losses for taxpayers. He knew that he was " buying " solely with the expectation of later being called upon to " resell " to his employer. To him the legal passing of title was a mere technicality which required satisfaction in order to benefit his employer. Instead of being a willing buyer, he was, rather, an agreeable employee, acceding to the request of his superior as called upon in emergency. The payment of a price and the delivery of certificates do not constitute the sole requisite of a valid sale. The parties must make a *bona fide* transfer as persons dealing at arm's length would do—the seller for the purpose of absolutely getting rid of the stock and the buyer for the purpose of absolutely acquiring it as his own without any condition covering its later return to the seller. Receiving a credit for the price and the mere indicia of ownership, without the mutual element of intent on both sides to complete an absolute sale, can not constitute a basis for a deduction for loss under the provisions of the tax law. A loss to be deductible must be a reality.

ARUNDELL not participating.