**UNITED STATES of America,**

v.

**James Sutton REGAN, Charles M. Zarzecki, Jack Z. Rabinowitz, Paul Berkman, Steven Barry Smotrich, Bruce Lee Newberg, Defendants.**

**No. S 88 Cr. 517 (RLC).**

United States District Court,
S.D. New York.

Nov. 27, 1989.

---

448

Otto G. Obermaier, U.S. Atty. S.D. New York, New York City, for U.S.; Mark C. Hansen, Neil Cartusciello, Peter G.A. Safirstein, Asst. U.S. Attys., of counsel.

Lowenstein Sandler Kohl Fisher & Boylan, Roseland, N.J., for defendant Regan; Theodore V. Wells, of counsel.

Morvillo, Abramowitz & Grand, P.C., New York City, for defendant Zarzecki; Paul Grand, Diana Parker, Lawrence S. Bader, of counsel.

Newman and Schwartz, New York City, for defendant Rabinowitz; Robert Hill Schwartz, of counsel.

Robinson Wayne & LaSala, Newark, N.J., for defendant Berkman; John D. Arseneault, of counsel.

Hayden, Perle and Silber, New York City, for defendant Smotrich; Joseph A. Hayden, Jr., Alan Silber, Paulette L. Pitt, of counsel.

Gerald B. Lefcourt, P.C., New York City, for defendant Newberg; Gerald B. Lefcourt, Joshua Dratel, of counsel.

Goldman & Hafetz, New York City, for defendant Newberg; Frederick P. Hafetz, Jeremy Gutman, Susan Necheles, of counsel.

ROBERT L. CARTER, District Judge.

Defendants James Sutton Regan, Jack Z. Rabinowitz, Charles M. Zarzecki, Paul A. Berkman, Steven B. Smotrich and Bruce Lee Newberg were brought to trial on June 19, 1989, on a superseding indictment charging conspiracy to commit securities, mail and wire fraud, to maintain false books and records, and to file fraudulent tax returns; substantive securities, mail and wire fraud, and tax violations; a RICO conspiracy; and substantive RICO violations. Defendants, except for Bruce Lee Newberg, are general partners or executives in Princeton/Newport Partners, L.P. ("PNP"). Newberg was a trader in the High Yield and Convertible Bond Department of Drexel Burnham Lambert, Inc. ("Drexel") in Beverly Hills, California.

Prior to trial the court dismissed counts 49, 50 and 51, and predicate act 9 of the RICO counts. *United States v. Regan*, 713 F.Supp. 629 (S.D.N.Y.1989) (Carter, J.).[1] The indictment was then redacted and the remaining counts renumbered. The trial was bifurcated, with the jury being required to determine first defendants' guilt or innocence. When and if the jury returned verdicts of guilty on the RICO counts, proof and argument relevant to RICO forfeiture were then to be presented for the jury's determination.

Following the completion of the evidentiary phase of the trial but before submission to the jury, newly numbered counts 52, 53, 54 and 55 of the superseding indictment were dismissed. The remaining 64 counts were renumbered in a second redaction of the superseding indictment and presented to the jury on July 27, 1989. On July 31, 1989, the jury returned verdicts of guilty on all counts except count 54, which charged defendants Zarzecki and Newberg with securities fraud in connection with an April 15, 1985 transaction involving C.O. M.B. ("COMB") securities.

On August 1, 1989, proceedings to determine the RICO forfeitures commenced. The government submitted a stipulation listing the defendants' partnership shares, salaries and Newberg's W-2 forms for 1984–1986, and a redacted copy of Drexel's plea agreement.[2] Smotrich presented an affidavit attesting to the comparability of his salary to those of other officials in the industry performing his functions, and Newberg offered copies of his 1984–1985 tax returns. Defendants and the government then presented arguments to the jury on the forfeiture question. After deliberations, the jury found the government had sustained its burden of proof beyond a reasonable doubt that Regan, Rabinowitz, Zarzecki and Berkman had partnership in-

---

1. The above cited opinion, 706 F.Supp. 1102 (1989) and 699 F.Supp. 36 (1988) are the court's pretrial opinions in this case and provide more extensive background facts than are to be found in the current opinion.

2. In a proceeding, somewhat peripheral to this one, various charges were brought against Drexel, including some similar to those brought against these defendants, particularly the charge of securities fraud in connection with COMB securities. Drexel entered into a plea agreement with the government pursuant to which Drexel pleaded guilty and paid a fine of $650 million.

terests in the enterprise, and that these defendants and Smotrich and Newberg had salaries and management fees. It determined the amount to be forfeited as follows: Regan $3 million, Rabinowitz, Berkman and Newberg $200,000 each, and Smotrich $1,245.85.

Defendants, as a group, now move for judgments of acquittal or a new trial. In addition, separate motions to this effect have been filed by Smotrich, Newberg and Zarzecki. A supplemental letter motion seeking dismissal of the RICO counts has been filed on behalf of all defendants. The government contends that the jury was required to order forfeiture of all defendants' interests in PNP and all fees (management and salary) received therefrom by any defendant, and moves to enforce mandatory forfeiture of all defendants' interests in the enterprise and all of their salaries and/or management fees received therefrom.

## I.

### A.

■ Defendants spend considerable effort arguing that the tax parks were valid transactions, even on the assumption "that sales and purchases were prearranged, not subject to market risk and solely tax motivated."[3] Defendants' Memorandum in Support of Motion for Judgments of Acquittal or for a New Trial ("Def. Mem. for Acquittal") at 2. Viewing the evidence in the light most favorable to the government, as the court must, *United States v. Martino*, 759 F.2d 998, 1002 (2d Cir.1985), the jury had sufficient evidence to conclude that the tax parks were not bona fide sales or transfers but sham transactions with no possible gains or losses to PNP except the minimum administrative fees charged by the accommodating brokerage firm for holding the securities and returning them back to PNP at the end of the agreed upon period. As I understand the controlling

law of this circuit, since these tax parks were not subject to market or other economic risks and were bogus purchases and sales in which the purported seller retained its proprietary interest in the security which had been allegedly bought by the accommodating brokerage firm, the transactions were mere pretenses and a fraud on the government. *United States v. Atkins*, 869 F.2d 135, 146 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 72, 107 L.Ed.2d 39 (1989); *United States v. Ingredient Technology Corp.*, 698 F.2d 88, 94–95 (2d Cir.), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983).

Defendants point out that what constitutes a "bona fide sale" is often a matter of debate and that a taxpayer is allowed to take a tax position, even if the taxpayer realizes that such position is unlikely to receive a favorable ruling, so long as a "reasonable basis" exists for such position. This is a correct statement of tax law, but misses the point. This is not a case about an honest effort to advance a tax argument unlikely to succeed. The jury found that defendants had fraudulent intent, and, therefore, the claim that there was a "reasonable basis" for defendants' tax position was rejected. Unless the jury's finding lacks substantial evidence to support it, *United States v. Wiley*, 846 F.2d 150, 153 (2d Cir.1988); *United States v. Buck*, 804 F.2d 239, 242 (2d Cir.1986), it remains undisturbed.

Defendants also make much of the fact that PNP was a profitable investment company which held securities that had declined in market value, and was not simply a tax-shelter factory. While this is true, it again misses the point. Defendants ignore the fact that the jury found them to have fraudulent intent in respect of the tax parks, and, therefore, statements about the bona fides of their business operations as a whole are irrelevant.

---

**3.** The term "tax park" refers to arrangements between PNP and cooperating brokerage houses whereby PNP would purport to "sell" various securities at their current market rate to a brokerage house pursuant to a prearranged agreement. Under such agreements, the securities would be held by the brokerage house for an agreed upon period then sold back to PNP at the same price at which it had originally "sold" the securities, plus a small fee to cover administrative costs. The purpose of the tax parks was to allow PNP to realize a loss on various securities for income tax purposes while in reality continuing to own the securities.

As they did at trial, defendants undertake a sophistical treatment of 26 U.S.C. § 1058 (1988) to support their unsound position. Section 1058 and the regulations thereto[4] provide rules for the income tax treatment of securities lending transactions. If the provisions of § 1058 and the regulations are met, the lender does not recognize a gain or loss on the transfer of securities or the return of identical securities. In order to meet § 1058 requirements,[5] there must be an agreement which: (1) provides for the return of identical securities to the transferor; (2) requires that payments be made to the transferor in amounts equivalent to all interest and dividends paid on the lent securities; (3) does not reduce the risk of loss or opportunity for gain of the transferor of the securities, and, therefore, such agreement must provide that the lender may terminate the loan upon notice of not more than five business days.

Defendants argue that § 1058 draws a bright line between sales and loans of securities, and that under § 1058 the transactions in question should be treated as bona fide sales. Def. Mem. for Acquittal at 13. In particular, defendants argue that in the absence of a right to reacquire securities within five business days and a written loan agreement, a transaction in which securities change hands is a bona fide sale as a matter of law. *Id.* at 14–16.

Although no cases or rulings could be found which interpret § 1058, the relevant legislative history is contained in Senate Report No. 95–762 (April 25, 1978) (reprinted at 1978 U.S.Code Cong. & Admin.News 1286). According to the Senate Report, § 1058 was enacted because of uncertainty regarding securities lending transactions. *Id.* at 1289. Apparently, the I.R.S. had declined to issue rulings as to whether securities lending transactions constituted a sale or exchange, and consequently there was some concern that transactions intended to be loans would be classified as sales. *Id.* at 1290. This concern discouraged the holders of securities from making such securities available for loans to brokers. *Id.* at 1289.

Because "[i]t is generally thought to be desirable to encourage organizations and individuals with securities holdings to make the securities available for such loans since the greater the volume of securities available for loan the less frequently will brokers fail to deliver a security to a purchaser within the time required by the relevant market rules," § 1058 was enacted to encourage the lending of securities to brokers to enable them to make timely deliveries of securities to purchasers. *Id.* at 1291. In sum, the legislative history shows § 1058 essentially to be a safe harbor for securities lending.

Despite the clear legislative history, defendants nevertheless argue that § 1058 is dispositive of their case. Basically, defendants' argument is that the realm of securities transactions is divided up into two categories: everything complying with § 1058 is a loan, and everything else is a sale. Since defendants' transactions clearly do not comply with the § 1058 requirements for loans, they argue that such transactions must, therefore, be sales.

The flaw in defendants' argument is that their vision is too limited. Contrary to defendants' assertions, § 1058 never defines a sale of securities and it does not follow that everything that is not a § 1058 loan is therefore a sale. Under defendants' logic, there could be no such thing as a sham sale because everything that is not a sale would have to be a loan. In sum, § 1058 has no applicability to defendants' case.

Defendants also argue that, under the relevant case law, their transactions were sales. Def. Mem. for Acquittal at 3–12, and Def. Reply Mem. for Acquittal at 2–6. Although defendants claim that the tax schemes in the cases upon which they rely "produced an economic result identical to that achieved by [PNP Arbitrage Part-

---

**4.** Proposed Regulations § 1.1058, published in the Federal Register July 26, 1983.

**5.** There are additional requirements for exempt organizations. *See* Proposed Regulations § 1.1058–1(b).

ners]," Def. Mem. for Acquittal at 11, all of the cases relied upon involved situations where there was at least a minimum amount of market risk. In *Clark v. Commissioner*, 2 B.T.A. 555 (1925), *acq.*, IV–2 C.B. 2[6], *Vauclain v. Commissioner*, 16 B.T.A. 1005 (1929), *acq.*, VIII–2 C.B. 54, and *Thiele v. Commissioner*, 32 B.T.A. 134 (1935), *acq.*, XIV–1 C.B. 20, the defendants bought and sold identical securities on the same day. Unlike these defendants, however, Clark, Vauclain and Thiele had to repurchase in the market and, therefore, their transactions were subject to market risk.

In *Doyle v. Commissioner*, 286 F.2d 654 (7th Cir.1961), the taxpayer purchased and simultaneously sold short the same number of shares of stock that she already owned. This transaction also involved market risk because had the price of the stock dropped before delivery of the short sale, the taxpayer would have had to meet a margin call. It was, therefore, unlike defendants' sham activities.

In *Fisher v. Commissioner*, 30 B.T.A. 433 (1934), the taxpayer had an option to repurchase the stock sold. Although the taxpayer holding the option had no risk, the person against whom the option was held was at risk because he would stand to suffer a loss if the market went down. Accordingly, this was not a sham transaction.

In *Davey v. Commissioner*, 30 B.T.A. 837 (1934), the seller had a 90 day option to repurchase and the buyer had a 90 day option to require the seller to repurchase. The seller took a risk that the value of the securities would go down and the buyer would require him to repurchase, and the buyer took a risk that the value of the securities would go up and the seller would then repurchase them.

In short, all of the above cited cases are in contrast to the transactions in question here where neither side bore any risk whatsoever.

**6.** This case also distinguished between an "accommodation sale" and a bona fide sale. *See*

**B.**

Nor do I need linger on the claim that the RICO statute is unconstitutionally vague as the Court of Appeals has ruled to the contrary. *United States v. Scotto*, 641 F.2d 47, 52 (2d Cir.1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981). While a number of recent Supreme Court holdings indicate that *stare decisis* may not carry the force it once held, defendants must address their arguments to the Court of Appeals. I certainly have no authority to ignore its holdings.

**C.**

■ Defendants complain that there were two conspiracies instead of the single conspiracy found by the jury. Whether the evidence establishes a single or several conspiracies is a question of fact for jury determination. *United States v. Friedman*, 854 F.2d 535, 562 (2d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989). The jury was charged as follows:

> The government contends that the indictment charges there was a single, all embracing conspiracy with several objectives. The defendants assert, without conceding that the government's proof establishes any conspiracy, that the evidence may permit an inference of more than the single conspiracy alleged in the indictment.
>
> The issue of whether there was one or more conspiracies is for you to decide. Proof of several separate conspiracies would not be proof of an overall conspiracy, unless one of the several conspiracies is the single conspiracy which the indictment covers.
>
> What you must do is determine whether the conspiracy charged in the indictment existed between two or more conspiracies. If you find no such conspiracy existed, then of course, you must acquit all the defendants of the conspiracy charge. However, if you are satisfied that such a conspiracy did exist, you

pp. 4–5.

must determine who were the members of that conspiracy as I told you before. In other words, to find a defendant guilty you must find he was a member of the conspiracy charged in this indictment and not a member of some other conspiracy, if you find there was any other.

Record at 4876.

Unless those instructions were in error, the only issue to be determined is whether, viewing the evidence in the light most favorable to the government, the evidence was sufficient to support the jury's finding of a single conspiracy.

■ The jury could readily conclude from the evidence that the defendants were engaged in tax parking to avoid being required to pay taxes which they ordinarily would have to pay, and that Zarzecki, on PNP's behalf in reciprocation, sought to assist Newberg and help Drexel in the COMB stock manipulation. The intimacy of the PNP headquarters where all the partner-defendants and Smotrich's offices were located, Hale's testimony and a Regan taped telephone conversation with Newberg constitute circumstantial evidence that Zarzecki's activities were done with the knowledge and approval of the other defendants. In any event, knowledge of the other defendants is immaterial. The law is so settled that all members need not be aware of all facts in a conspiracy or be involved in all facets of the conspiracy, see, e.g., United States v. Nersesian, 824 F.2d 1294, 1303 (2d Cir.1987), that it is virtually sterile scholarship to cite authority in support of this proposition. Although it was reasonable for the jury to conclude that the partners and Smotrich were fully aware of what each of them were doing, even the lack of such overall knowledge by some of the defendants would not preclude the finding of a single overarching conspiracy in this case.

### D.

In his individual motion, Zarzecki seeks acquittal on the mail and wire fraud counts, the tax fraud counts 60–64, and the RICO conspiracy counts. As indicated, the evidence showed that the PNP office arrangement was an intimate one. Zarzecki was the head trader and his desk was a few feet from the desks of Hale and Berkman, PNP traders who arranged most of the tax parking transactions. Hale testified that Zarzecki complained to him about the commission PNP had to pay brokerage firms for allowing PNP to park its securities with them. Zarzecki also received month end pricing sheets generated on the computer with prices filled in by Berkman or Hale. To these sheets were stapled the list of parked securities and copies were distributed to all the PNP partners and to Smotrich. That evidence was sufficient for the jury to convict him on all the counts of which it found him guilty.

Newberg, a trader at Drexel, contends in his individual motion that he cannot be held for assisting in the preparation of false tax returns, for mail and wire fraud, RICO Acts 3, 4 and 8 of counts 2 and 3, Counts 26–45 and Counts 64–68. The evidence showed that on December 27, 1984, Berkman called Drexel to secure help in doing tax parks. Newberg was away and Berkman spoke to Cary Maultasch, Newberg's assistant, to whom he explained the purpose was to take a tax loss. Maultasch later advised Berkman that he had reached Newberg and obtained his approval, allowing Berkman to do the tax parks with Drexel.

Hale also testified concerning a meeting which took place in the PNP conference room just after year end 1984, when it was decided to park the securities with a prearranged agreement to buy them back after 31 days to avoid any impact the straddle rules might have. Regan said he would call Newberg to see if he could handle the tax parking for them. Record at 473. Later Regan announced in the trading room that he had talked to Newberg, and then PNP proceeded to park securities with Newberg. Record at 475. The jury could infer that Newberg knew that these tax parks were for illegal tax purposes and went along.

Individually, Smotrich argues that the taped conversations between Berkman and several officers of a brokerage house in

Boston referred to at the trial as the Boston tapes, admitted for the limited purpose of providing the context in which Berkman's statements were made, Berkman's state of mind and to be used solely against him, were later illegally admitted against Smotrich when the court charged the jury that it could use the statements and acts of a proven member of the conspiracy made in furtherance of the conspiracy against any other member of the conspiracy. A similar complaint is made in regard to a conversation Zarzecki had with a relative of one of PNP's limited partners which also had been admitted solely as evidence of Zarzecki's state of mind. No objection was made by Smotrich or any other defendant at the time the allegedly offending charge was given lifting these limitations and allowing the tapes and conversation to be used against Smotrich as well. As the government points out, this was an oversight and had the matter been brought to the court's attention at the robing room conference after the charge had been given but before final submission of the case to the jury, an appropriate explanation could have been given to the jury to avoid any possible misunderstanding. Indeed, the record shows that the court, after conferring with counsel, returned to the courtroom and gave further clarifying instructions to the jury. By not making an objection at the time when the matter could have been clarified, defendant waived this objection and his claim of error now comes too late. Rule 30, F.R.Cr.P.; *United States v. Friedman*, 854 F.2d 535, 555 (2d Cir.1988).

The remainder of Smotrich's claims is based on the premise that he should have been granted a separate trial. That issue was disposed of at the pretrial stage of these proceedings, *U.S. v. Regan, supra,* 713 F.Supp. at 641, and need not be revisited again here.

### E.

In a separate letter motion dated October 16, 1989, the defendants bring to the court's attention internal memoranda distributed to prosecutorial personnel in the Department of Justice. The memorandum from Assistant Attorney General Edward

S.G. Dennis, Jr. concerns the requirement for approval from the Department of Justice as a prerequisite to moving for a temporary restraining order under 18 U.S.C. § 1963(a) in connection with a crime involving RICO forfeiture and is not relevant to this case. Ex. A, Ltr. from Gov't dated October 26, 1989.

■ The memorandum from Assistant Attorney General Shirley D. Peterson sets Department of Justice policy concerning the use of mail fraud charges as RICO predicates where only the filing of false federal tax returns is involved. Authorization of the Tax Division is required before mail fraud counts are filed independently or as a predicate for RICO charges when the only mailing is a tax return or other IRS document or the charge is that the mailing was used to promote a federal tax fraud scheme. The memorandum states that federal tax offenses are not predicates for RICO charges and that such use could be viewed as an attempt to circumvent Congressional intent. The Tax Division is to be consulted early for determination as to whether a mail fraud charge is to be based on the mailing of an IRS form or document. These memoranda had been the subject of several newspaper reports speculating about their implications. Ex. B, Ltr. from Gov't dated Oct. 26, 1989.

Defendants assert that "it is a fair inference that the new guidelines were prompted by this case," Ltr. on behalf of defendants dated Oct. 16, 1989 at 3, *id.* at 5–6, and that the guidelines articulate the defendants' position that "Congress did not intend to reach the kind of federal tax related conduct in this case." Contending that the government has not brought this kind of RICO case before and will not bring it again, defendants move for dismissal of the RICO counts.

Before receiving defendants' letter, newspaper reports of the memoranda had prompted the court to request the government to furnish it with copies of the reported memoranda and to give the court the government's view of the effect of the guidelines on its position concerning the

validity of the RICO charges in this case and the right of the government to seek mandatory forfeiture of all defendants' interest in the enterprise including salary and management fees.

The government's position is straightforward: The Peterson memorandum has no application to this case because it was issued after commencement of the trial; and, additionally, both the original and superseding indictments had been reviewed and approved at a time when the policy expressed in the memoranda had been "formulated but had not yet [been] promulgated." It was pointed out that the guidelines provide for individualized determinations in each instance which the government argues does not mean that proceedings similar to this case will not go forward in the future. Ltr. of Gov't dated Oct. 26, 1989.

This is not the only federal tax fraud indictment with mail or wire fraud violations brought as a RICO violation. *See United States v. Busher*, 817 F.2d 1409, 1412 (9th Cir.1987). The Peterson memorandum does not bar this or future tax fraud and mail fraud charges from being brought under the RICO statute. What is required is prior discussion with the Department of Justice personnel in Washington before the local prosecution may proceed. Such discussion took place in this instance. Accordingly, the motion is denied since I see no basis for dismissing the RICO counts on the strength of the Peterson memorandum.

## II.

### A.

The government moves for the court to rule that the jury was required to order total forfeiture of all the interests of the partner-defendants in PNP and all the salaries and management fees received from defendants from PNP.

The court is satisfied that the controlling law in the circuit left no discretion to the jury. Based on its findings, the jury was required to order forfeiture of the defendants' entire interest in the RICO en-terprise. *United States v. Regan*, 858 F.2d 115, 119 (2d Cir.1988); *United States v. Porcelli*, 865 F.2d 1352, 1364–65 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989); *United States v. Walsh*, 700 F.2d 846, 857 (2d Cir.), *cert. denied*, 464 U.S. 825, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983). *In accord, United States v. Kravitz*, 738 F.2d 102, 104–05 (3d Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1752, 84 L.Ed.2d 816 (1985); *United States v. Hess*, 691 F.2d 188, 189–91 (4th Cir.1982); *United States v. Cauble*, 706 F.2d 1322, 1349 (5th Cir.1983), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984); *United States v. L'Hoste*, 609 F.2d 796, 809–14 (5th Cir.), *cert. denied*, 499 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980); *United States v. Busher, supra*, 817 F.2d at 1413; *United States v. Godoy*, 678 F.2d 84, 87–88 (9th Cir.1982), *cert. denied*, 464 U.S. 959, 104 S.Ct. 390, 78 L.Ed.2d 334 (1983); *United States v. Anderson*, 782 F.2d 908, 917–18 (11th Cir. 1968). I am also satisfied that such mandatory forfeiture was required of the salary and management fees of defendants Regan, Zarzecki, Rabinowitz, Berkman and Smotrich because it was clear from the jury verdict that these monies came from the enterprise it had found to be RICO tainted.

Indeed, except for the presence of Newberg, there would have been no need to have the jury determine the amount to be forfeited. Not having a partnership interest or salary or fees from the enterprise, any forfeiture required of Newberg had to be exacted pursuant to § 1963(a)(3), which amount the jury had to determine.

After pretrial hearings to determine the value of defendants' potentially forfeitable interests and assets to allow defendants to post a bond to secure the government interest in the event the defendants were found guilty on the merits of the requisite RICO violations, the court held that the partnership interests, and the salaries and management fees of the PNP partner-defendants were forfeitable, and that the salaries of Smotrich and Newberg were subject to forfeiture. *United States v. Regan*,

699 F.Supp. 36, 38 (S.D.N.Y.1988) (Carter, J.). On October 21, 1988, an order was entered by the court that the reasonable value of the property subject to forfeiture was $14,011,323 representing the agreed upon value of the partner-defendants' interests in PNP and $3,611,573 representing the interest of Regan, Rabinowitz, Zarzecki, Berkman and Smotrich in other forfeitable property from the period July, 1984, to February 12, 1986.

After the return of the superseding indictment, the parties negotiated a new stipulation and order dated January 30, 1989, as to the value of potentially forfeitable property. The stipulation set the sum of $16,011,573 as the value of the partnership interests involved and $3,164,876 as potentially forfeitable salaries and management fees. The stipulation was so ordered by the court on January 31, 1989.

Accordingly, the amounts set forth in the stipulation constitute the agreed upon value of the interests, salaries and management fees of the PNP defendants subject to forfeiture. Regan's argument that half of his interest rightfully belongs to his wife cannot be credited. No mention was made to the court that Mrs. Regan shared in Regan's interest at the time the stipulation was so ordered on January 31, 1989. Pursuant to the October 21, 1988 order based on representations made by defendants and on a so ordered stipulation dated January 31, 1989, the amounts set forth therein must be accepted as accurate representations of the defendants' interest and fees.

Accordingly, based on its verdict, the jury was required to order forfeiture of $13,336,887 in partnership interest plus $1,759,975 in salary and management fees for Regan; $791,199 in partnership interest plus $454,507 in salary and management fees for Rabinowitz; $762,613 in partnership interest plus $558,328 in salary and management fees for Berkman; $1,120,874 in partnership interest plus $264,483 in salary and management fees for Zarzecki, and $124,583 in salary for Smotrich.

## B.

■ That, however, does not end the matter. Forfeiture is limited by the Eighth Amendment prohibition against cruel and unusual punishment. *United States v. Walsh, supra,* 700 F.2d at 857 (forfeiture reaches all assets of the tainted enterprise except as limited by the 8th Amendment); *United States v. Huber,* 603 F.2d 387, 397 (2d Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980) (forfeiture is constitutional when "keyed to the magnitude of a defendant's criminal enterprise as it is in RICO"); *United States v. Horak,* 833 F.2d 1235, 1251 (7th Cir.1987) ("We are not insensitive to the concern of vast prosecutorial discretion in combination with potentially enormous forfeiture orders might in some circumstances threaten Eighth Amendment rights."); *United States v. Busher, supra,* 817 F.2d at 1413–16 (remand for forfeiture rehearing in light of Eighth Amendment concerns). What those limitations are has not been clearly established and there has been very little guidance given to trial courts in determining what yardsticks to apply to meet Eighth Amendment strictures in RICO forfeiture situations.

In *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), the United States Supreme Court held that the Eighth Amendment prohibits not only barbaric punishment but also those penalties disproportionate to the crime committed: "a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentence imposed on other criminals in the same jurisdiction; and (iii) the sentence imposed for the same crime in other jurisdictions." *Solem,* 463 U.S. at 292, 103 S.Ct. at 3010. These requirements can only be satisfied by a case-by-case assessment of the constitutionality of the particular punishment imposed. *See also, Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910).

This circuit in *United States v. Lizza Industries, Inc.,* 775 F.2d 492 (2d Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1459, 89 L.Ed.2d 716 (1986), a case subsequent to *Solem,* endorsed application for forfeiture

under 18 U.S.C. § 1963(a)(1) against an Eighth Amendment challenge even in a situation in which forfeiture reached profits defendants could have made irrespective of their illegal activities. The Court reasoned that to limit RICO forfeiture solely to a defendant's ill-gotten gains would frustrate Congress's goal in deterring criminal enterprises. *Id.* at 498–99. The provision in question, § 1963(a)(1), requires forfeiture of "any interest [a defendant] has accepted or maintained in violation of § 1962." The language here embraces "the proportionality analysis" set forth as the threshold requirement in *Solem,* although the *Lizza Industries* panel rejected its application in that case.

Under § 1963(a)(2), the provision applicable here, however, a defendant is required to forfeit 100 percent of his interest in the illegal enterprise, even though some parts of the activities of the enterprise might be legitimate. The proportionality analysis comes into play in such cases only on application of the Eighth Amendment since 100 percent forfeiture in some cases might be such an excessive penalty as to exceed unconstitutionally the gravity of the offense. *United States v. Feldman,* 853 F.2d 648, 663 (9th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1164, 103 L.Ed.2d 222 (1989) ("eighth amendment concerns may arise when a defendant must forfeit his or her entire interest in an otherwise legitimate business, even though only a few minor acts in the course of conducting the business were the predicate acts sufficient for a RICO violation").

The Second Circuit has recognized this possibility. *United States v. Porcelli, supra,* 865 F.2d at 1364 ("[t]he Eighth Amendment may limit the forfeiture where the enterprise is 'substantially engaged in legitimate business'") (quoting *United States v. Walsh, supra,* 700 F.2d at 857); *United States v. Huber, supra,* 603 F.2d at 397 (district court intervention may be appropriate "where the forfeiture threatens disproportionately to reach untainted property of a defendant"). The Second Circuit, however, has yet to give shape and contour to Eighth Amendment restrictions applicable to § 1963(a)(2) forfeitures.

The Ninth Circuit has gone further than any other Circuit, as far as our research has been able to discover, in setting firm yardsticks to guide district courts in determining the specificity of Eighth Amendment constraints on § 1963(a)(2) forfeitures. Even though § 1963(a)(2) forfeiture is mandatory, "the district court must avoid unconstitutional results by fashioning forfeiture orders that stay within constitutional bounds." *United States v. Busher, supra,* 817 F.2d at 1415. In applying *Solem,* judges are required to make specific findings regarding (1) the magnitude of the forfeiture, (2) the benefit attained by the defendant, (3) the defendant's state of mind and motive in committing the RICO violations, and (4) the degree to which the enterprise in question is tainted with criminal conduct. *Id.* The critical inquiry is whether "the interest ordered forfeited is ... grossly disproportionate to the offense committed...." *Id.* Under this analysis, legitimate businesses will not ordinarily be forfeitable in their entirety under § 1963(a)(2).

While it is concededly hazardous to venture into an area which has not yet been charted by our Court of Appeals, § 1963(a)(2) forfeiture raises acute Eighth Amendment concerns. Questions of fairness and equity must be faced, and even equal protection considerations lurk in the wings. Although I have rejected the defendants' claims concerning the Department of Justice's memoranda as a basis for dismissal of the RICO counts, for those defendants who were convicted only of crimes related to various forms of federal tax violations, these memoranda are relevant to the question of forfeiture. In these cases forfeiture of the defendants' entire partnership interests in PNP, plus salary and management fees seems so excessive as to breach Eighth Amendment constraints, if those constraints are to have any applicability to forfeiture.

Although our research has found no case that addressed the question of whether a RICO forfeiture is operative when the sole predicates are acts constituting a federal tax fraud, the Ninth Circuit in *United*

*States v. Busher, supra,* has unequivocally concluded that federal tax fraud activity may serve as the sole predicate for RICO violations. In *Busher,* however, the district court's order of forfeiture of the defendants' entire business was remanded for reconsideration in light of the Eighth Amendment pursuant to guidelines discussed above. There is no indication, however, that the Ninth Circuit intervened because the RICO predicate acts involved only federal tax fraud violations.

There are a number of cases in which it is unclear whether federal tax fraud activity was among the RICO predicate acts. In those cases while the defendants were convicted of federal tax fraud, they were also convicted of other offenses which alone could serve as necessary RICO predicates. *United States v. Bissell,* 866 F.2d 1343, 1348 n. 2 (11th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 146, 107 L.Ed.2d 104 (1989); *United States v. Aimone,* 715 F.2d 822, 824 (3d Cir.1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3586, 82 L.Ed.2d 883 (1984).

There are also cases in which defendants were charged under RICO for inducing investors to buy fraudulent tax shelters. *United States v. Eckhardt,* 843 F.2d 989 (7th Cir.), *cert. denied* — U.S. ——, 109 S.Ct. 106, 102 L.Ed.2d 81 (1988) (criminal RICO); *Hofstetter v. Fletcher,* 860 F.2d 1079 (8th Cir.1988) (full text of opinion not published) (civil RICO); *United Energy Owners Committee, Inc. v. United States Energy Management Systems, Inc.,* 837 F.2d 356 (9th Cir.1988) (civil RICO). However, since the underlying offense in the above cases was in defrauding those induced to invest in the fraudulent schemes, they are not on point.

On the other hand, state tax fraud schemes have served as the sole predicate offenses for both criminal and civil RICO actions. *Illinois Dept. of Revenue v. Phillips,* 771 F.2d 312 (7th Cir.1985) (civil RICO action upheld against a retailer whose only offense was the filing of fraudulent state sales tax returns); *accord, Illinois ex rel. Hartigan v. Flisk,* 702 F.Supp. 189 (N.D. Ill.1988).

This Circuit in *U.S. v. Porcelli, supra,* has upheld a criminal RICO prosecution based solely on state sales tax fraud, an activity not criminalized under New York law. Although characterizing the case as pushing RICO "to its outer limits," the convictions were affirmed "by virtue of the extraordinarily broad sweep of RICO and of the federal mail fraud statute...." *Id.* at 1355. The jury ordered forfeiture of $4,755,000 and 34 corporations. The Court of Appeals affirmed the forfeiture in large part but remanded to the lower court to determine the extent to which interest in untainted properties "would not have been acquired or maintained but for [the defendant's] fraudulent scheme." *Id.* at 1365. In addition, other properties were held forfeitable to the extent of contribution from the companies through which defendant maintained his fraudulent operation. *Id.* Previously in *United States v. Ianniello,* 621 F.Supp. 1455 (S.D.N.Y.1985) (Weinfeld, J.), *aff'd,* 808 F.2d 184 (2d Cir.1986), *cert. denied sub nom. Cohen v. United States,* 483 U.S. 1006, 107 S.Ct. 3229, 97 L.Ed.2d 736 (1987), a RICO conviction was held based on state sales tax fraud, submitting fraudulent applications to the New York State Liquor Authority and bankruptcy fraud. Although federal income tax violations were charged, such violations do not appear to have served as a basis for the RICO claims.

■ Although, as the above discussion indicates, this area is not clear in this Circuit, the court is convinced that it has responsibility to fashion forfeiture orders in this case that lie within permissible constitutional constraints. Our research has uncovered no case in this jurisdiction in which a defendant was convicted solely of federal tax fraud infractions in which RICO forfeitures were ordered. Nor have we discovered such cases in other jurisdictions. Consideration of the Department of Justice's internal memoranda becomes relevant at this point, since it is safe to assume from these memoranda that the likelihood of future federal tax fraud cases being brought as RICO violations because the mails or wires have been used in connection with the tax fraud scheme is remote. Under

these circumstances, to require Regan, Rabinowitz and Berkman to forfeit any assets would appear to be both unjust and unwarranted.

The government did not quantify during the trial the tax benefits which defendants obtained through their unlawful schemes. In their reply brief in support of its motion for mandatory forfeiture, the government has given estimates of the amount of taxes the defendants succeeded in avoiding paying pursuant to the tax parking devices. The government conceded that the actual benefits obtained by defendants were lower than the government's calculations, but the lower figure results from accounting adjustments, which the government suggests would not have been made if this indictment had not been filed. The government's figures are based on the unadjusted accounting methods pursuant to which it is calculated that Regan has permanently evaded the payment of $96,717 in 1986 federal income taxes and deferred $134,804 more of 1986 taxes to 1987–1990. Rabinowitz has evaded permanently $4,291 in 1985 taxes and deferred $28,453 more in 1985 taxes to 1986–1990 returns. Zarzecki has permanently evaded $29,584 in 1985 taxes and deferred $35,596 more in 1985 taxes to 1987–1990 returns. Berkman has permanently evaded $129,725 in 1984 taxes and deferred $119,532 more in 1984 taxes to 1985–1987 returns.

These benefits to the defendants Regan, Rabinowitz and Berkman seem grossly disproportionate to the penalty total forfeiture would exact. In Regan's case, he would be required to forfeit some $15 million in assets for $96,717 of illegal tax benefits, Rabinowitz to forfeit $1.245 million in assets for $4,291 in illegal tax benefits and Berkman to forfeit $1.32 million in assets for $129,725 in illegal tax benefits. Smotrich received no tax benefits from the tax parking devices, and to require him to forfeit some $125,000 in salary seems also grossly out of line with his crime.

Accordingly, the court concludes that to require forfeiture of Regan's, Rabinowitz's and Berkman's partnership interests in PNP plus their salaries and management fees received therefrom and Smotrich's salary would appear to constitute cruel and unusual punishment within the meaning of the Eighth Amendment pursuant to *Solem's* yardsticks of disproportionality as to the offense itself, and as to the punishment imposed on similarly situated criminals in this and other jurisdictions. Thus the forfeiture of the assets of defendants Regan, Rabinowitz, Berkman and Smotrich is set aside.

■ Zarzecki and Newberg stand on a different footing. Both defendants were convicted not only of federal tax fraud and mail fraud in connection therewith, but also of securities fraud and wire fraud in connection therewith. Moreover, while schemes to cheat the government of tax dollars are intolerable, schemes to manipulate and corrupt the nation's financial markets could undermine public confidence in the nation's financial institutions and, thereby, put the country's economic health at risk. I realize there was no evidence of market dislocation or any resultant investor harm, but what was attempted is egregious enough.

Unlike the federal tax fraud, the activities of Zarzecki and Newberg sought to victimize the investing public, rather than the government. The federal securities laws were designed to preserve the integrity of the country's financial markets and to protect them from the kind of manipulation Zarzecki and Newberg engaged in their effort to hold down COMB stock. Such illegal attempts to keep the ebb and flow of the market from responding to natural forces is a crime, regardless of how unsuccessful the outcome is in illegal gains for the perpetrator or how benign the results are for the potentially victimized investors. The Newberg–Zarzecki convictions for both federal tax fraud and securities fraud provide an appropriate basis for mandatory forfeiture of all of Zarzecki's partnership interest in PNP and all salary and management fees derived therefrom and for the § 1963(a)(3) forfeiture determined by the jury as to Newberg. These forfeitures are within the parameters deemed appropriate in other RICO convictions and do not of-

460

fend Eighth Amendment proscriptions. Accordingly, forfeiture of Zarzecki's partnership interest in PNP of $1,120,874 and salary and fees of $267,483 is ordered; and forfeiture of $200,000 by Newberg, as found by the jury, is ordered effectuated.

### III.

In sum, defendants' motions for acquittal or a new trial are denied. The government's motion that the jury was required to order a mandatory forfeiture of all the partnership interests of the partner-defendants in PNP, and the salaries and management fees received by defendants from PNP is granted. Forfeiture, however, is barred by the Eighth Amendment for defendants Regan, Rabinowitz, Berkman, and Smotrich. Full forfeiture is appropriate for defendant Zarzecki and forfeiture ordered by the jury of Newberg is undisturbed.

IT IS SO ORDERED.